Marie B. RUSSELL, Plaintiff–Appellant,

v.

**MICRODYNE CORPORATION,**
**Defendant–Appellee.**

**Equal Employment Opportunity Commission; Equal Employment Advisory Council, Amici Curiae.**

Marie B. RUSSELL, Plaintiff–Appellant,

v.

**MICRODYNE CORPORATION,**
**Defendant–Appellee.**

**Equal Employment Opportunity Commission; Equal Employment Advisory Council, Amici Curiae.**

Nos. 93–1895, 93–2078.

United States Court of Appeals,
Fourth Circuit.

Argued April 13, 1994.

Decided Sept. 28, 1995.

---

**ARGUED:** Douglas Benjamin Huron, Kator, Scott & Heller, Washington, DC, for appellant. Karen Marie Moran, Office of General Counsel, Equal Employment Opportunity Commission, Washington, DC, for amicus curiae EEOC. Arne Morris Sorenson, Latham & Watkins, Washington, DC, for appellee. **ON BRIEF:** Philip J. Simon, Kator, Scott & Heller, Washington, DC, for appellant. James R. Neely, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Office of General Counsel, Equal Employment Opportunity Commission, Washington, DC, for amicus curiae EEOC; Douglas S. McDowell, Ann Elizabeth Reesman, McGuiness & Williams, Washington, DC, for amicus curiae Equal Employment Advisory Council. Penelope A. Kilburn, Latham & Watkins, Washington, DC, for appellee.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

Reversed and remanded by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MURNAGHAN and Senior Judge HARVEY joined.

## OPINION

ERVIN, Chief Judge:

Marie Russell filed suit against Microdyne Corp., her employer, alleging that it had

discriminated against her on the basis of her sex in violation of Title VII, 42 U.S.C. §§ 2000e to –17. Her complaint alleged that she had been denied promotion, had been subjected to sexual harassment in the workplace, and had been subjected to reprisal for her opposition to such treatment. Relying on "after-acquired evidence" of misrepresentations in Russell's resume and application for employment, which came to light as part of Microdyne's discovery in this litigation, Microdyne moved for summary judgment. The district court granted the motion and entered judgment for Microdyne on all counts. For the reasons stated below, we now reverse.

## I.

### A.

Russell holds a bachelor's degree in marketing from Pennsylvania State University, as well as a master's degree in business administration with a concentration in marketing from George Washington University. Following the completion of her undergraduate studies in 1984, she worked for approximately two years in the Washington, D.C., office of Wang Laboratories, at that time one of the leading computer manufacturers in the United States. At Wang, she worked as a sales representative, and as such undertook numerous marketing activities.

In 1986, Russell moved from Wang to become the Marketing Manager for Management Engineers, Inc. (MEI), a software company and value-added reseller that apparently specialized in developing applications and providing support for Wang computer systems. As marketing manager, she was involved in a plethora of marketing and public relations activities for this company. She was responsible to Peter Kauffman, the president of MEI, who later described her as an "excellent employee" and termed her work "creative and innovative." It was while working for MEI as its marketing manager that Russell also obtained her MBA degree from George Washington by attending night school.

At the end of 1989, MEI was forced for purely economic reasons to lay off a number of its employees. One of those so affected was Russell. Although Russell was laid off as a full-time employee, Kauffman valued her contribution to the company. As he later explained:

I wanted her to continue working for MEI, and we arranged that she would continue performing as Marketing Manager for MEI on a contract basis, with the expectation that she would average about 20 hours per week. She was paid at the rate of $25 per hour. Ms. Russell worked for MEI on this basis from early 1990 until she was hired by Federal Technology Corporation [1] in the fall of that year. It was my hope that MEI's financial situation would eventually permit us to bring Ms. Russell back full time, but this had not occurred by the time she was hired by Federal Technology Corporation.

(Footnote supplied). While continuing her duties for MEI, Russell also performed marketing duties on a part-time basis for two other companies, Market Dynamics, Inc., and Environmental Industries, Inc.

### B.

For purposes of summary judgment, the story told below is essentially that set out by Russell in her complaint and declaration. Microdyne essentially denies every allegation concerning its wrongdoing detailed therein. Microdyne placed an advertisement in the Sunday edition of the *Washington Post* on September 16, 1990, to fill the position of Marketing Assistant for a newly-acquired product line. Two days later, Russell sent Microdyne a letter and resume applying for the position. Shortly thereafter, she received a telephone call from Microdyne asking her to come in for an interview.

After arriving at Microdyne's offices, Russell was given an application form to complete. She indicated in the application that she was available on one week's notice, and that her requested salary was $40,000. In the section on experience, she listed MEI in the first set of questions. She indicated her starting salary with MEI to have been $32,-

---

**1.** Federal Technology Corporation later changed its name to Microdyne.

000, and in response to a question regarding ending salary she wrote "$25/hr—50k." [2] After listing her starting date with MEI as "4/86," Russell placed dashes through the ending date, indicating that she was still employed by MEI. In response to the question "May we contact now?", Russell wrote "No." She later explained that while she understood that Microdyne could contact MEI before hiring her, she did not want MEI to know that she was in the market looking for another job, since MEI continued to hope that it could rehire her full time. In response to the form's question regarding her reason for leaving MEI, she wrote "growth, financial stability of company." While Russell listed MEI and Wang on the form and supplied information as to each, she did not list the two companies for which she had done part-time work over the preceding few months.

Russell interviewed with Ralph Mason, a senior vice president, Joe Losquardo, the Director of Marketing, and Paul Sinclair, the human resources manager. According to Russell's declaration filed in opposition to the motion for summary judgment, she did not attempt to conceal the fact that she was working part-time for MEI while also working for other companies at the same time. In her interview with Mr. Losquardo, he asked her whether she had any experience in the field of market research, and she indicated to him that she was doing such work for a company on a part-time basis. He asked for the name of the company, and she named Market Dynamics. In addition, when asked for phone numbers through which she could be reached, Russell provided the names and numbers of both Market Dynamics and MEI.[3]

According to handwritten comments on her letter and application form, the company viewed her as an "A+" applicant who had "done it all," was "used to long hours" and whose demeanor was marked by "energy" and good "attitude." She was offered and accepted the position, with an initial salary of $60,000, fifty percent more than she had sought on her application.

Taking her allegations to be true for purposes of summary judgment, Russell walked into a nightmare of sexual harassment and anti-woman bias. During her time at Microdyne, Russell kept a diary in which she recorded many of her experiences on the job, a copy of which is included in the joint appendix and the substance of which is set out in her brief on appeal. We decline to repeat the details of her experience here in toto; suffice it to say that, if true, the behavior of all of the individuals involved, all senior personnel of the company, from the president down, was crude and reprehensible.

While Russell was employed at Microdyne, she received praise from a number of officials within the company, and she was apparently highly successful in handling the EXOS product line. Mason and others at some point became unhappy with Losquardo's performance as marketing director and decided to replace him. Mason asked Russell whether she would be able to assume the marketing director's responsibilities, and she responded that she would. Nevertheless, she never received this promotion. According to Russell's contemporaneous notes, at the end of July 1991, Mason called her into his office to

**2.** The annualized income from $25 per hour, assuming a 40 hour work week, is approximately $50,000.

**3.** Subsequent to the district court's grant of summary judgment for Microdyne, Russell obtained additional evidence that indicated that officials at Microdyne were aware of her outside work for other companies besides MEI, and of MEI's financial difficulties. Deborah Piram, an employee of Microdyne, declared:

> Shortly before [Russell] joined the company, Ralph Mason told me that she was going to be hired. He said that we were lucky to get Marie because she was in high demand and was working as a consultant for a few compa-

nies. He also said that we were fortunate to be working for a company that was doing well, and he said that Marie had been working for a company that was not doing well and that she was not working full-time there.

Pursuant to Fed.R.Civ.P. 60(b), Russell moved for relief from the district court's judgment based on this newly acquired evidence. The district court denied this motion. On appeal, Russell argues that the district court abused its discretion in denying this motion. Because we reverse the judgment and remand this case for further proceedings in the district court, we need not address this issue.

show her a new sofa bed that had been installed. At the time, the bed was pulled out from the sofa. Mason put his arm around Russell and said, "Hey, want to get lucky, what do you say, you and me," while winking and pointing to the bed. Russell left his office. After Russell's return from a conference the next month, Mason called her into his office and told her that he was reorganizing the division and that the three individuals who reported to Russell were being taken from under her supervision. When asked why he was doing this, he said that he had his reasons, and, again according to Russell's contemporaneous notes,

> [he] goes on to tell me an analogy about his wife who used to work in a chauvinistic environment but she changed jobs and is much happier now. He ended "I don't know what I am trying to say, but this is the way it is."

Rather than take this broad hint, Russell persevered in her position. During the fall, having met certain quotas, Russell approached a company official to ask about a contractually-required bonus. Three times this official asked her, suggestively, "What will you give me?" She raised the topic a week later with the same official in his office.

> He had a plastic hand in his office that he picked up and started patting my head and back with. He also held down all the fingers on this hand except the middle one, and grinned at me and told me his hand was out of control. When I asked about my bonus he again asked "What will I get?" When I said the same level of good marketing that I had been giving the company he just continued, "What are you going to give me?" with a smile. When I offered lunch he said, "Just think about it." The facial expression and body language very much suggested a come on from him.

In January 1992, Russell approached Dick Anderson, the new general manager of the EXOS line, to ask about the status of her evaluation and raise. In a closed door session, Anderson told Russell that he had proposed a significant raise based on her accomplishments and hard work, but that there was resistance from more senior management. According to Russell, Anderson told

her that his understanding was that the president of the company, Philip Cunningham, thought that, as a woman, she was being paid too much money. Anderson told her that Cunningham did not think she was worth that much money, and that a woman was good for two things, to go to bed with and to answer the phone.

### C.

In February 1993, Russell, who was still employed at Microdyne, filed this suit. The suit contains three claims, all alleging violations of Title VII of the Civil Rights Act of 1964. First, Russell alleged that Microdyne had denied her equal opportunities for advancement and compensation on the basis of her sex. Second, Russell alleged that Microdyne had subjected her to sexual harassment sufficiently severe to alter the terms and conditions of her employment by subjecting her to an offensive work environment. Third, Russell alleged that Microdyne's treatment of her was partly in retaliation for her opposition to Microdyne's illegal actions.

During discovery, Microdyne learned, allegedly for the first time, of the disparity between the information Russell provided on her resume and her actual experience. It then filed a motion for summary judgment on the theory that this information, had Microdyne known of it at the time of Russell's application, would have led Microdyne not to hire her, and that, as a result, she could not complain of any maltreatment that she had suffered at the company. Asserting that such "after-acquired evidence" provided a complete defense to illegal discrimination, as opposed to a limitation on the remedy available, Microdyne asserted that judgment in its favor was proper.

Russell opposed the motion for summary judgment on several grounds. First, Russell introduced evidence that appeared to dispute the company's assertions that this evidence was in fact new. As noted above, she asserted that she did not attempt to hide her then-current employment position, and provided explanations for each of the allegedly fraudulent statements on her resume. Second, she disputed the materiality of the statements in question, and whether the company would in

fact have dismissed her for such misstatements. Finally, she argued that, even if summary judgment were proper for Microdyne, such evidence only affected the remedy available and was irrelevant to the question of liability under Title VII.

After a hearing, the district court held in favor of Microdyne on all counts on June 28, 1993. The district court found that Russell had misrepresented her current employer; her current salary; her reason for leaving MEI; and her recent employers by not listing the other two companies for which she had done work.[4] The court also accepted the assertions of Microdyne's officials that they did not know this information at the time Russell was hired, and that they would have fired her upon learning of it.[5] Finally, the court held that such evidence of misrepresentations barred all claims of subsequent discrimination on the job. Microdyne then immediately fired Russell.

Following the denial of a postjudgment motion based on newly acquired evidence, see note 4, *supra,* Russell timely appealed. After oral argument, we issued an order on November 1, 1994, holding this case in abeyance pending the Supreme Court's decision in *McKennon v. Nashville Banner Publishing Company,* — U.S. —, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). After the Court handed down its opinion in that case, we permitted the parties to file supplemental briefs addressing the issues it raised.

## II.

### A.

▮ In the beginning, there was what can be called the traditional claim of employment discrimination arising from disparate treatment. Using either direct or indirect evidence, the burden on the plaintiff, and the inquiry for the court, remained a simple task: whether, by a preponderance of the evidence, it could be found that the employer treated the plaintiff differently on account of the presence of one of the prohibited factors. While the presence of class action litigation, and the analytic three-step dance applied when the evidence was not direct but rather indirect, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), all added complexity to the formula, the question at the heart of the case remained the same, and still does today: "whether plaintiff has proven that the defendant intentionally discriminated against him because of his race." *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). As direct evidence of discrimination became less prevalent, and employers advanced numerous reasons to justify their challenged employment decisions, the *McDonnell Douglas* framework of analysis, with its shifting burdens of production and persuasion, became the predominant framework of analysis. In such cases, once an employee establishes a prima facie case of discrimination, an employer must advance a legitimate, nondiscriminatory reason for the challenged decision. If it succeeds in so doing, the burden on the plaintiff is to demonstrate that the given reason is not the real reason for the employer's action, but instead a mere pretext. If the plaintiff can show both that the reason advanced was a sham *and* that the true reason was an impermissible one under the law, *id.* at — – —, 113 S.Ct. at 2751-52, the plaintiff will have demonstrated successfully that the employer acted illegally and that the plaintiff deserves recompense. Thus, the pure discrimination case was one in which a single reason motivated the challenged decision, the parties offered different reasons, and the fact-finder was required to determine which one of the two stories was true.

This straightforward inquiry presupposed that a single "cause" could be ascribed to the particular challenged employment decision.

---

4. Although the district court resolved a motion for summary judgment, it appears not to have examined whether there are disputes as to the material facts in question, as required under Fed.R.Civ.P. 56, but rather to have reviewed the facts introduced by both parties and have drawn conclusions of fact based thereon.

5. It should be noted that, even if Microdyne first learned of this information during the Title VII litigation, it still did not fire Russell immediately.

In time, however, it became clear that such was not always the case. As best demonstrated by the facts of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), there are some instances in which dual motivations, one illegal and one legal, may exist and simultaneously motivate an employer's actions; these have come to be referred to as "mixed-motive" cases.[6] In *Price Waterhouse,* Ann Hopkins was denied promotion to the accounting firm's partnership, and she brought an action under Title VII alleging sex discrimination. Price Waterhouse, on the other hand, argued vigorously that she was denied partnership because of her lack of interpersonal skills. The question became what the impact would be if *both* issues animated the firm's partnership decision, i.e., whether the contemporaneous presence of a permissible reason for the decision made irrelevant the presence of the discriminatory animus.

A plurality of the Supreme Court held that where an impermissible motive enters an employment decision, the employer can escape liability only if it can prove that "even if it had not taken gender into account, it would have come to the same decision regarding a particular person." *Id.* at 242, 109 S.Ct. at 1786 (plurality opinion). This is to say that, if a factfinder could "strip away" the discriminatory and illegal motivation from the employer's decision, a permissible reason could still be found to have been animating the employer's decision at the time and in full:

> An employer may not, in other words, prevail in a mixed-motive case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The very premise of a mixed-motive case is that a legitimate reason was present, and indeed, in this case, Price Waterhouse already has made this showing by convincing Judge Gesell that Hopkins' interpersonal problems were a legitimate concern. The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.

*Id.* at 252, 109 S.Ct. at 1791–92 (plurality opinion).

The Court rejected the position that a finding of mixed motives should only affect the matter of damages available to the plaintiff; instead, the plurality held that if the fact-finder found that a permissible reason existed to induce the employer to make its decision, then the employer will escape liability. *Id.* at 244 & n. 10, 109 S.Ct. at 1787 & n. 10 (plurality opinion). Thus, in the Court's view, the statute would not be violated in instances in which one of the reasons underlying the action taken by the employer was proper. Congress overruled this element of the holding in the Civil Rights Act of 1991, which limits the impact of findings of mixed motive to affect the remedy available, and not the question of whether an employer has violated the law. Pub.L. No. 102–166, § 107,

---

6. The mixed-motive doctrine first came to light in the area of constitutional doctrine in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In that case, the school board declined to renew Doyle's contract, and informed him of this decision in a letter that gave two reasons for its action. First, he had made obscene gestures at students in the lunchroom, which had caused controversy. Second, he had made comments and provided information to a local radio station concerning new rules relating to teacher dress codes. The latter expression was determined to be protected by the First Amendment, and could not serve as the basis for the Board's firing of Doyle. However, an additional, permissible, reason for the termination existed, and the Court focused on how that reason interacted with the impermissible one.

The Court determined that Doyle still could have been "fired" if the Board could show by a preponderance of the evidence that it would have reached the same decision not to renew Doyle's contract even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. According to the Court, a rule that insulated Doyle from reprisal "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.... The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct." *Id.* at 285–86, 97 S.Ct. at 575. The analysis in *Price Waterhouse* and subsequent cases builds upon this reasoning in the mixed-motive area.

105 Stat. 1071 (1991), codified at 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B).

What is notable about both the "single motive" indirect evidence cases under *McDonnell Douglas* and the "mixed-motive" cases under *Price Waterhouse* is that, in both instances, the parties challenge the underlying motivation or motivations for the disputed employment action. Although the differences between the two types of cases are relatively minor from the parties' perspectives, in terms of their evidentiary tasks, the difference in analysis from the perspective of the fact-finder is significant: in the indirect evidence cases, the employer offers a legitimate, non-discriminatory reason for the action, and for a plaintiff to win the fact-finder must find that discriminatory animus, rather than the offered reason, was the true reason for the action; in the mixed-motive cases, although they often will be identical in their evidentiary presentation,[7] the questions faced by the fact-finder are more complex, for it must determine not only whether it finds the employer's legitimate reason to be true, which is the end of the matter in the single-motive indirect evidence case, but it must also decide whether the plaintiff has demonstrated that the action was motivated by a discriminatory reason as well. Thus, although the results of the analyses are significantly different, the analytic difference between these two types of cases is razor-thin, which has made the area a particularly difficult one for the courts, and has prompted significant criticism from the academy. *See generally* George Rutherglen, *Reconsidering Burdens of Proof: Ideology, Evidence and Intent in Individual Claims of Employment Discrimination*, 1 Va. J. Soc. Pol'y & L. 43 (1993).

### B.

In contrast to the narrow analytic distinctions between the indirect single-motive case and the mixed-motive case, the "after-acquired evidence" case stands on completely different ground. While the current label has become widespread, it is something of a misnomer, for consistency and accuracy would title it the "after-acquired motive" case. In such cases, the employer does not assert that it had in its mind a legitimate non-discriminatory reason that explains its challenged action and that would insulate it, to whatever extent, as in the mixed-motive case; instead, the employer argues that it has acquired evidence since the time of that action that, had it known it at the time, would have led it to do exactly what it did, except for a legitimate reason rather than an illegal one. Thus, unlike the other two styles of cases, there is no dispute as to the motivating force behind the decision as made; instead, the employer attempts to demonstrate that there was what can only be called a "constructive motive" for the decision that should insulate its action from attack.

Prior to the Supreme Court's decision in *McKennon v. Nashville Banner Publishing Company*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the circuit courts were split regarding whether after-acquired evidence of wrongdoing by an employee could bar recovery against an employer who had discriminated illegally. *Compare Welch v. Liberty Machine Works, Inc.*, 23 F.3d 1403 (8th Cir.1994); *O'Driscoll v. Hercules Inc.*, 12 F.3d 176 (10th Cir.1994), *vacated*, —— U.S. ——, 115 S.Ct. 1086, 130 L.Ed.2d 1056 (1995); *McKennon v. Nashville Banner Publishing Co.*, 9 F.3d 539, 541 n.3 (6th Cir. 1993), *rev'd*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *Washington v. Lake County*, 969 F.2d 250 (7th Cir.1992); *Johnson v. Honeywell Information Systems, Inc.*, 955 F.2d 409 (6th Cir.1992); *Summers v. State Farm Mut. Automobile Ins. Co.*, 864 F.2d 700 (10th Cir.1988), *with Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221 (3rd Cir.1994), *vacated*, —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 286 (1995); *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364 (7th Cir.1993); *Wallace v. Dunn Constr. Co.*,

---

7. The exception is the instance in which an employer admits to the evidence of discrimination, but argues that a permissible motive underlies its reasoning as well, in which case the court need not concern itself with the question of whether the plaintiff has met her burden under *Hicks* to show that discriminatory animus was a reason for the challenged action, and will instead focus simply on whether the defendant's offered permissible reason is a "true" reason separately underlying the action.

968 F.2d 1174 (11th Cir.1992), *vacated and rehearing en banc granted*, 32 F.3d 1489 (1994). Some circuits held that an after-acquired motive for an otherwise discriminatory action provided a complete defense, precluding a plaintiff from establishing liability or obtaining relief for the employer's conduct in violation of the law. *See, e.g., Summers*, 864 F.2d at 708. Others held that such after-acquired evidence of employee wrongdoing should only concern the remedies available to the employee once liability was established, and that it should not be admissible unless the employer demonstrated that it would have discovered the evidence in the absence of the discrimination litigation, because, otherwise, the employer would benefit from its discriminatory conduct. *E.g., Wallace*, 968 F.2d at 1181–84.

In *McKennon*, the plaintiff had filed suit against her employer, the Nashville Banner Publishing Company ("the Banner"), under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* At McKennon's deposition, the Banner learned that she had removed from its offices certain confidential documents, supposedly as "insurance" and "protection" in case she was fired because of her age. *McKennon*, — U.S. at ——, 115 S.Ct. at 883. Both the district court and Sixth Circuit held that the after-acquired evidence of employee misconduct precluded recovery by the plaintiff. For the purpose of summary judgment, the Supreme Court assumed that the Banner had discriminated against McKennon on the basis of age. *Id.* The Court's further premise was "that the misconduct revealed by the deposition was so grave that McKennon's immediate discharge would have followed its disclosure in any event." *Id.*

The *McKennon* Court held that after-acquired evidence of wrongdoing that would have resulted in termination did not bar all relief for an earlier violation of the ADEA, but operated to limit the relief available. *Id.* at —–——, 115 S.Ct. at 884–87. According to the unanimous opinion, "it would not accord with [the recovery scheme underlying the ADEA and Title VII] if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act." *Id.* at ——, 115 S.Ct. at 884. The Court noted, however, that the ADEA and Title VII "do not constrain employers from exercising significant other prerogatives and discretions in the course of the hiring, promoting, and discharging of their employees." *Id.* at ——, 115 S.Ct. at 886.

Under *McKennon*, in order for an employer to invoke the defense successfully, "it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at —– ——, 115 S.Ct. at 886–87; *accord Ricky v. Mapco, Inc.*, 50 F.3d 874, 876 (10th Cir.1995). The "general rule" when a discriminating employer meets that burden is that "neither reinstatement nor front pay is an appropriate remedy." *McKennon*, — U.S. at ——, 115 S.Ct. at 886. Instead, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id.* The *McKennon* court also made clear that its analysis applied not only to claims under the ADEA, but to those under Title VII as well. *See id.* at ——, 115 S.Ct. at 884 (noting the "common substantive features" and "common purpose" of the two schemes); *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1153 (6th Cir.1995) ("[W]e are persuaded by [*McKennon*'s] language that it applies equally to a Title VII claim.").[8]

---

8. We note that the *McKennon* decision is consistent with this court's earlier decision in *Smallwood v. United Air Lines*, 728 F.2d 614 (4th Cir.) ("*Smallwood II* "), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984), which unambiguously supports the view that the impact of after-acquired evidence is limited to remedial matters alone. The *Smallwood* case came to this court twice, and understanding that fact is critical to understanding the decision. Smallwood applied for a job with United Air Lines as a flight officer. His application disclosed that he was 48 years old. United had a policy that it would not process applications for flight officer positions from individuals over 35. Smallwood filed suit under the ADEA. United stated that its "no one over 35" rule was a "bona fide occupational qualification" (BFOQ) permitted under the ADEA. Addi-

## III.

■ Finally, we turn to the application of the *McKennon* framework to these facts. In this instance, the matter was resolved on Microdyne's motion for summary judgment. We review the granting of a motion for summary judgment *de novo. Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990) (en banc), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only where the moving party shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.[9] *See Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 974 (4th Cir.1990). The court's function at the

summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). We therefore must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Nevertheless, the party opposing summary judgment must satisfy the burden of proof by offering more than a mere "scintilla" of evidence, and must produce evidence sufficient for a reasonable jury to find in her favor. *Anderson,*

tionally, United stated that it would not have hired Smallwood regardless of his age. The district court found for United on the BFOQ defense and did not reach the second reason. This court reversed and remanded, holding that United's age cutoff was not a BFOQ. *Smallwood v. United Air Lines,* 661 F.2d 303 (4th Cir.1981) ("*Smallwood I* "), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982).

Upon remand, the case subsequently went to trial. The district court then held that it did not think the company had met its burden in proving the "wouldn't have hired anyway" defense, which was based on subsequently-acquired information that Smallwood had engaged in improper conduct while with his former employer. Accordingly, the district court granted injunctive relief and ordered backpay and attorney's fees.

United then appealed from the part of the judgment granting backpay and attorney's fees, alleging that the trial judge was clearly erroneous in its finding against United that it hadn't made out its "wouldn't have hired" defense. We agreed and reversed.

The panel opinion begins by drawing a distinction between violation and remedy and explaining that this distinction was at the heart of the case:

[T]here are generally two issues in disparate treatment cases whether the action be under either the ADEA, Title VII, or Section 1981: One has to do with the substantive issue of violation of the applicable statute or constitutional provision; the other (which, it must be emphasized, only becomes relevant if a violation is proved) involves the remedy which generally presents the question of compelled hiring, reinstatement, or promotion accompanied with backpay. These two issues are separate and distinct, and their resolution depends on different, or at least additional, evidence and findings. Thus, in this case, the admitted refusal of the defendant to process the plaintiff's application because of its rule prohibiting the processing of job applications by flight officers

over 35 years of age constituted, as we held in the first appeal, a violation of ADEA and entitled the plaintiff to injunctive relief against the present and future use of such rule. That specific issue—one of violation—was decided by our decision in the first appeal in this case and is the law of the case. But that determination did not trigger anything more than a mere presumption of a right in the plaintiff to the remedy of employment and backpay, a presumption which was subject to being defeated by proof by the preponderance of the evidence on the part of the defendant that the plaintiff would not have been hired anyway if there had been no discrimination.

*Smallwood II,* 728 F.2d at 617–18 (footnote omitted). That the court was concerned only with the remedial impact of the "wouldn't have hired" theory is evident throughout the opinion's language. See *id.* at 618 ("the two issues require separate findings"); *id.* at 619 ("there is no question that the two issues, though requiring separate and different evidence and standards of evaluation, can be tried together"); *id.* at 620 ("our first decision in this case ... reversed the ruling of the district court of no-violation but remanded the case in order that the district court might resolve the issue which had not been resolved by the district court in its first decision, *i.e.,* the issue of backpay"); *id.* at 624 ("the disqualification for employment and thus for backpay, based on a recreating of the circumstances that would have existed but for the illegal discrimination, may be established by evidence which had not been developed at the time the claimant was denied employment, provided such evidence is proved at trial of the remedy issue").

9. We note that, given our analysis set forth in part II, *supra,* the effect of after-acquired motives on a plaintiff's discrimination suit affects the remedies stage and not the ultimate question of liability, so that the motion in this instance is for partial summary judgment, which also is available under Rule 56.

477 U.S. at 252, 106 S.Ct. at 2512. Summary judgment is thus appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, *id.* at 248–49, 106 S.Ct. at 2510–11, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the nonmoving party has the burden to prove. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■■■■■ We begin by noting that *McKennon* dealt with after-acquired evidence in a wrongful termination case. In this case, Russell did not suffer any immediate negative employment decision after Microdyne's alleged discovery of her supposed falsehoods. Absent such a negative employment decision premised upon evidence of wrongdoing, the defense cannot apply and the remedies available are not curtailed in any way. Under these rather unusual circumstances, however, we do not think this is fatal to Microdyne's use of the defense, for the company faced a difficult situation in which the availability of this defense was not established, and it acted in an understandably conservative manner, in fear of the additional liability for discriminatory retaliation that might attach to its conduct. Thus, we believe that the after-acquired evidence doctrine, as limited by the *McKennon* Court, might be available in this case. We note, though, that in post-*McKennon* cases, an employer's decision not to terminate a Title VII plaintiff would be dispositive on this issue. *Cf. Shattuck v. Kinetic Concepts, Inc.,* 49 F.3d 1106, 1108 (5th Cir. 1995) ("We are persuaded that the pertinent inquiry, except in refusal-to-hire cases, is whether the employee would have been fired upon discovery of the wrongdoing....").

■■■■ The district court, however, erred by concluding on summary judgment that the defense applies as a matter of law. First, there was contradictory evidence in the declarations and affidavits of Russell and Microdyne as to whether the evidence was in fact newly acquired in the course of discovery. According to Russell, she did not keep this information secret, but provided a significant amount of it to interviewing officials. The information disclosed that she was working only part-time at MEI and that she was working for another company at the same time. Second, there is a genuine dispute as to whether Russell actually engaged in "misconduct" at all, particularly in light of *McKennon*'s emphasis on the need for serious wrongdoing. The elements supporting invocation of the after-acquired evidence defense were that Russell lied in answering the question concerning her salary at MEI as "$25/hr—50k," because, although she was indeed making $25 an hour, she was not working there full time and thus not earning $50,000 annually; and that Russell lied in answering the question concerning her reason for leaving MEI as "growth, financial stability of the company," because she was reduced from the full-time Marketing Manager to a part-time consulting position with the same responsibilities as a result of the financial instability of the company.[10] Third, the evidence as to whether these slight discrepancies would have caused Microdyne not to hire Russell is itself unclear. Although the affidavits submitted on this matter were quite rigid, see, e.g., Affidavit of Ralph Mason, J.A. 44–45, the deposition testimony of Mr. Mason demonstrates that "many factors" go into a decision of this type and suggests that the answer was not so clear cut. J.A. 109–10. Although the *McKennon* Court accepted a similar conclusion on summary judgment regarding the employer's hypothetical termination decision, the plaintiff in that case admitted she "would have been terminated" for her misconduct. *McKennon,* 9 F.3d at 541 n.3. Clearly, such is not the case here, and Microdyne has not met its burdens under the *McKennon* test.

■■■■ On remand, even if Microdyne can prove that Russell's ostensible "wrongdoing was of such severity that [she] in fact would have been terminated on those grounds alone if [Microdyne] had known of" her alleged misdeeds, *McKennon* at —— ——, 115 S.Ct. at 886–87, and that it was unaware of her conduct, *Ricky,* 50 F.3d at 876, the defense would only limit Russell's

---

**10.** We admit that we remain mystified as to the falsehood present in Russell's explanation that her reason for leaving MEI was because of the financial stability of the company, given the actual facts of what transpired.

ability to be reinstated or to recover front pay. She would remain eligible for wages lost because of a discriminatory failure to promote through May 25, 1993, the date on which "the new information was discovered," irrespective of any after-acquired evidence of wrongdoing. *See id.* at ——, 115 S.Ct. at 886. Likewise, she certainly is eligible for wages lost because of a discriminatory failure to promote through the same date, again irrespective of any after-acquired evidence of wrongdoing. Furthermore, unlike the ADEA, Title VII now permits the recovery of both compensatory and punitive damages, neither of which had previously been available under Title VII. *See* 42 U.S.C. § 1981A. In *Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994), the Supreme Court held that the Civil Rights Act of 1991, which amended the applicable provisions of Title VII, did not apply retroactively. Based on that decision, we have held that a jury may properly award damages in connection with any unlawful conduct that occurred after November 21, 1991, the Act's effective date. *Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 354–55 (4th Cir.1994). Thus, because Russell's complaint contains examples of unlawful activity in 1992, she would be eligible for damages, both compensatory and punitive, resulting from actions occurring between November 21, 1991, and May 25, 1993, regardless of whether the doctrine of after-acquired evidence applies. Of course, if Microdyne cannot meet the stringent test set out in *McKennon* for application of the defense, Russell is eligible for the full panoply of remedies available to victims of discrimination under Title VII, with the exception of compensatory and punitive damages for conduct that occurred prior to November 21, 1991. *See Brinkley–Obu,* 36 F.3d at 354–55.

### IV.

For the reasons stated above, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*