**Jenny T. BAYLES, Plaintiff,**

v.

**The FIDELITY BANK, Defendant.**

**Civil No. 1:97CV960.**

United States District Court,
M.D. North Carolina.

Dec. 18, 1998.

754

Thomas M. Van Camp, Mary March Exum, Van Camp Hayes & Meacham, P.A., Carthage, NC, for plaintiff.

James Randall Hiner, Ward and Smith, P.A., New Bern, NC, for defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

Plaintiff Jenny T. Bayles ("Bayles") has filed claims against Defendant The Fidelity Bank ("Fidelity") alleging sex and age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* Bayles has also asserted a supplemental claim for wrongful discharge under North Carolina law. Fidelity has moved for summary judgment on all claims. For the following reasons, Fidelity's motion will be granted in part and denied in part.

### FACTS

The following facts are established in the pleadings, affidavits, deposition testimony, and exhibits offered by the parties. Where there are disputes, each party's position is given.

Bayles, who is female and over the age of forty, began working for Centura Bank ("Centura") in or about 1983. In November 1991, Centura promoted Bayles to the position of branch manager at Centura's Moncure branch in Chatham County. Bayles never experienced discipline problems with Centura and received periodic raises while at Centura.

Fidelity is a North Carolina banking corporation headquartered in Fuquay–Varina. Fidelity operates approximately thirty-five (35) branches throughout the state. In May 1995, Fidelity purchased the Moncure branch from Centura and retained Bayles as manager of the branch. As a branch manager in Fidelity's "eastern region," Bayles came under the direct supervision of executive vice president and regional supervisor Mike Whitley ("Whitley"). Both parties agree that Bayles experienced significant difficulties in adjusting to the change in management. Bayles and Fidelity disagree, however, as to why the difficulties occurred.

Fidelity contends that Bayles' problems resulted from her inability to meet the more stringent demands that Fidelity placed upon its branch managers. Fidelity notes that it scrutinized her performance as manager much more closely than Centura did. Fidelity asserts that Bayles' loan files were haphazard and incomplete and that the office was in a constant state of disarray. In particular, Fidelity points to Bayles' consistent failure to adhere to its loan procedures, which resulted in an inordinately high number of loan documentation errors referred to as "exceptions." Fidelity states that these exceptions resulted in poor loan quality for the branch.

In addition to her loan documentation problems, Fidelity contends that Bayles had a poor work ethic and time management skills. Fidelity contends that Bayles did not respond to strong suggestions from Whitley and others that she conform her hours to the needs of the branch and that she organize, prioritize, and delegate effectively to her staff.

In order to deal with these problems, Fidelity states that it took numerous steps to train and develop Bayles into an effective branch manager. Despite receiving extensive training and supervision, Bayles' performance never improved. Instead, Fidelity claims that Bayles responded with complaints that the branch was understaffed, the job had too many demands, or that she did not have enough time to get everything done.

In May 1996, Fidelity conducted a routine internal audit of the Moncure branch. The branch received one of two worst ratings for branches audited between February 1995 and December 1997. The most notable violations of operational categories related to "excessive number of [loan documentation] errors and omissions" and "excessive amount of cost" invested with respect to each loan made.

The poor performance of the Moncure branch in the May 1996 audit led to a meeting on July 9, 1996, between Bayles, Whitley, and the president of Fidelity, Haywood Lane ("Lane"), at Fidelity's headquarters in Fuquay–Varina. At this meeting, Fidelity informed Bayles that her performance in the area of loan documentation and quality was unacceptable, and she was told that if her performance did not improve immediately "changes would be made." (Lane Aff. ¶ 15). Bayles responded that she would "get the job done." (*Id.* at ¶ 16).

Fidelity contends that despite this ultimatum Bayles' performance did not improve to an acceptable level. In fact, during her last sixty days of employment, Bayles continued to make the same quantity and type of documentation errors and continued to maintain poor work hours and habits. Fidelity contends that by the fall of 1996 it had reached the point at which it could no longer tolerate Bayles' poor performance and failure to improve. On September 16, 1996, Lane and Whitley made a decision to terminate Bayles. (Whitley Aff. ¶ 18). On September 17, 1996, Whitley met with Bayles at the Moncure branch to inform her of this decision and the reasons therefor. Whitley cited excessive and recurring loan documentation errors, poor loan quality, and her poor work habits. (*Id.*)

Because Bayles' termination had not been pre-planned, Fidelity had few options available with respect to her replacement. Ultimately, Fidelity replaced Bayles with Kurt Wahlstrom. Fidelity concedes that Wahlstrom lacked experience as a branch manager, but maintains that he had performed well as a teller. A second individual, Kevin Fish, assisted Wahlstrom in the transition until December 1996. Since Wahlstrom took over as branch manager, Fidelity contends that both Wahlstrom and the Moncure branch have performed well. (Whitley Aff. ¶ 19).

In contrast, Bayles adamantly denies that she had a poor attitude or work habits. She also denies that her performance was unsatisfactory in light of her "overwhelming number of responsibilities" and

Fidelity's "unrealistic expectations." (Bayles Aff. ¶ 14). Moreover, Bayles maintains that she was held to a different standard than her male counterparts in the areas of discipline, evaluations, staff support, salary, raises, and work·performance. Bayles notes that both before and after Fidelity's purchase of the Moncure branch she maintained an excellent relationship with the bank's customers and her co-workers.

Bayles states that she routinely spent an average of ten hours a day at the bank or on bank business, often working late into the night or on weekends to get her work done. Despite these long hours, Bayles contends she was unable to complete her work effectively because of the unreasonable work responsibilities placed upon her. Bayles asserts that most other Fidelity branches had two or three people assigned to perform the same duties she was performing by herself. In addition, she contends that at least on certain occasions the Moncure branch had the highest transaction rate per teller. These transactions kept the tellers extremely busy and, on occasion, required Bayles to act as teller.

Bayles maintains that she discussed her need for additional staff and space at various times with Fidelity management. Despite these requests, Fidelity refused to provide her with any long-term help because it believed that staffing at the branch was appropriate after comparing the Moncure branch to similar branches. Bayles argues that these comparisons made by Fidelity were inappropriate because the branches Fidelity used to compare did not approach the volume of business at the Moncure branch. Moreover, Bayles notes that these offices had more staff members than the Moncure branch. According to Bayles, Fidelity's refusal to provide additional staffing and its inappropriate comparisons· to other branches is evidence that Fidelity was setting her up

for failure in order to justify her eventual termination. (Bayles Aff. ¶ 14).

Bayles also asserts that she received different treatment than other male branch members with respect to her loan documentation problems. Bayles contends these managers received more assistance with loan documentations, and also that male branch managers with loan documentation problems similar to hers have not been fired.

In addition to her complaints that she was overworked and understaffed, Bayles complains that Fidelity discriminated against her by paying her substantially less than similarly situated male branch managers. In support of this claim, Bayles relies on a 1996 salary survey which shows that male managers averaged $44,520.00 in salary as compared with $35,840.00 in salary for female managers. (Pl.'s Br., Ex. 11, pp. 8–13).

In addition to this comparative evidence, Bayles contends that a statement made in connection with an armed bank robbery which occurred at her branch on September 4, 1996, and a related statement made to her at the time of her dismissal demonstrate that her sex was a motivating factor in Fidelity's decision to terminate her. Soon after the robbery, Bayles, Whitley, and the two other employees at the Moncure branch held a meeting to discuss the branch's security system. Bayles asserts that during the meeting Whitley stated, "If a man had been in the branch, maybe things would have gone differently" or words to that effect.[1] (Bayles Aff. ¶ 18). Bayles also asserts that Whitley told her at the time she was fired that the robbery played a big part in the decision to terminate her.[2] (*Id.* at ¶ 19).

Upon her termination, Bayles filed a charge of sex and age discrimination with the EEOC. Bayles alleged sex discrimination in connection with her disparate sala-

---

1. Whitley denies making this statement.

2. Whitley denies making this statement and Fidelity denies that the robbery had any influence on the decision to terminate her.

ry and her termination and age discrimination in connection with her termination. After receiving notice of right to sue, Bayles timely filed this action.

## DISCUSSION

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Cray Communications v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can simply argue the absence of evidence by which the non-movant can prove her case). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient. There must be evidence on which the [fact-finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

### A. Bayles' Claims under Title VII and the ADEA

Title VII and the ADEA make it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's sex or age. 42 U.S.C. § 2000e–2(a); 29 U.S.C.

§ 623(a)(1). Employment discrimination cases involving disparate treatment fall within two categories: mixed motive cases and pretext cases. *Fuller v. Phipps,* 67 F.3d 1137 (4th Cir.1995). Distinguishing between the two categories is essential because the standard of liability is more favorable to plaintiffs in a mixed-motive case. *Id.*

Pretext cases are the most common form of disparate treatment action. *See id.* Pretext cases are based on the burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff meets the relatively easy burden of establishing a *prima facie* case, an inference of discrimination arises and the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory act. *Texas Dep't of Community Affairs,* 450 U.S. at 253, 101 S.Ct. 1089. If the employer meets its burden of articulating a legitimate non-discriminatory reason for the adverse employment action, the *McDonnell Douglas* presumption disappears. *Id.* at 255 n. 10, 101 S.Ct. 1089. The plaintiff then bears the ultimate burden of persuasion to prove that the reason articulated by the employer was not truly the reason for the adverse action and that the employer engaged in intentional discrimination against the plaintiff. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742.

In contrast, if the plaintiff can present sufficient evidence to show that an unlawful motive was a substantial factor in the employment decision, then the plaintiff qualifies for the more advantageous standards of liability applicable in a mixed-

motive case. *See Fuller*, 67 F.3d at 1141; *White v. Federal Exp. Corp.*, 939 F.2d 157, 160 (4th Cir.1991). The Supreme Court established a mixed-motive framework in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under the original *Price Waterhouse* framework, if a plaintiff presented sufficient evidence to show that a discriminatory factor played a motivating part in the employer's decision, the burden of the persuasion then shifted to the employer to show by a preponderance of the evidence that it would have made the same decision in the absence of the discriminatory motive. *Id.* at 258, 109 S.Ct. 1775 (plurality opinion); *id.* at 259–60, 109 S.Ct. 1775 (White, J., concurring); *id.* at 276, 109 S.Ct. 1775 (O'Connor, J., concurring).

The Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(m), modified the *Price Waterhouse* framework. Under the 1991 Act, an employer can no longer avoid liability by showing that it would have made the same decision in the absence of a discriminatory motive. Instead, an employer remains liable wherever unlawful discrimination "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). While proof that the employer would have made the same adverse decision in the absence of discriminatory motive no longer insulates an employer from liability, it does limit the remedies available to the plaintiff. *See* 42 U.S.C. § 2000e–5(g)(2)(B); *see also Russell v. Microdyne Corp.*, 65 F.3d 1229, 1237 (4th Cir.1995).

In this case, Bayles contends that she has presented sufficient evidence to survive summary judgment under either the mixed-motive approach or the pretext approach. Therefore the court will proceed to analyze her claims under each method.

1.  Mixed–Motive Analysis

■ To obtain the favorable treatment of a mixed-motive case, a plaintiff must present "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller*, 67 F.3d at 1142 (citing *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995); *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993)).

■ The only evidence offered of this type by Bayles is Whitley's alleged statement that the robbery may not have occurred if a man had been there coupled with his alleged statement that the robbery was a factor in the decision to fire her. While Fidelity denies these statements occurred, the court must resolve this factual dispute in Bayles' favor at this stage. Assuming these statements were made, they directly reflect a discriminatory attitude about sex and bear directly on the decision to terminate Bayles. Fidelity argues that the statement about the robbery is an isolated, ambiguous statement which, by itself, is insufficient to raise a genuine issue of fact. *See EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992). However, Whitley's alleged statement that the robbery played a factor in the decision to fire Bayles provides the required "nexus ... between the alleged discriminatory statement and an of the employment decisions made by the [employer]." *Id.* (emphasis in original). Accordingly, unlike cases involving isolated ambiguous remarks, Bayles has presented sufficient evidence of discrimination to survive summary judgment with respect to her claim that Fidelity terminated her because of her sex. However, because these statements do not bear directly on her claims of disparate treatment in salary because of sex or unlawful termination because of age, she must rely on the *McDonnell Douglas* framework in order to survive summary judgment with respect to those claims.

2.  The *McDonnell Douglas* Framework

■ For the purposes of this motion, the court will assume that Bayles has es-

tablished her *prima facie* case of discrimination because of sex or age. At this point, Fidelity must come forward with a legitimate, non-discriminatory reason for her salary level and her termination. Fidelity has come forward with such a reason: Bayles' significant problems with loan exceptions, her perceived poor work habits, and the Moncure branch's poor performance in the June 1996 audit. At this point, then, the inference of discrimination drops away and Bayles must establish that Fidelity's proffered legitimate reasons were a pretext for illegitimate discrimination.

The Fourth Circuit has adopted a "pretext-plus" approach for determining whether a plaintiff has made a sufficient showing of pretext to survive summary judgment. *See Vaughan v. MetraHealth Cos., Inc.*, 145 F.3d 197 (4th Cir.1998). Under the pretext-plus standard, "an employer is entitled to summary judgment unless the ... plaintiff has adduced sufficient evidence 'both that the reason was false, *and* that [age or sex] discrimination was the real reason.'" *Id.* at 202 (quoting *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 201 (4th Cir.1997) (emphasis in original)).

Dealing first with the claim that Fidelity terminated her because of her age, Bayles has come forward with no evidence to show that, even if Fidelity's proffered reasons are false, Fidelity terminated her because of her age. Instead, aside from the fact that she was replaced by someone younger than she was, all of her proffered evidence is directed at disparate treatment based on sex. Accordingly, Fidelity is entitled to summary judgment on Bayles' claim under the ADEA.

■ Bayles has also failed to come forward with sufficient evidence to show that the real reason for her disparate salary was her sex. Bayles' sole evidence in this regard is her salary comparisons. (*See* Pl.'s Br. at 10–11). This evidence, however, has little if any probative value and cannot establish a claim under Title VII. *See Gunther v. County of Washington*, 623 F.2d 1303, 1321 (9th Cir.1979) (statistical evidence of comparable work alone is not enough to establish a *prima facie* case), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). First, it fails to account for such factors as differences in credentials, experience levels, tenure with the bank, prior salary history, or cost of living. Moreover, it does not account for Bayles' unique status as a carryover from Centura and that the terms of Fidelity's purchase and assumption agreement provided that Centura employees would be paid "initial compensation not less than current levels." (Lane Aff., Ex. A at § 1.6). Finally, any minimal probative value of this evidence is destroyed by the fact that Bayles' replacement, Kurt Wahlstrom, was paid an initial annual salary of $23,500.00, or a mere $180.00 more than Bayles' annual salary of $23,320.00. Accordingly, the court finds that Fidelity is entitled to summary judgment as to Bayles' claim of disparate treatment with respect to salary because of her sex.[3]

### B. *Bayles' Wrongful Discharge Claim*

Bayles' claim for wrongful discharge based on the North Carolina Equal Employment Practices Act (NCEEPA), North Carolina General Statute § 143–422.2, is subject to the same standards as those developed under Title VII and the ADEA. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir.1995) (adopting *McDonnell Doug-*

---

**3.** The first cause of action in Bayles' complaint is based on Title VII. However, it does also reference the Equal Pay Act. To the extent Bayles' wage claim is based on the Equal Pay Act as opposed to Title VII, that claim must fail because she has failed to establish a *prima facie* case by showing that the branch managers within Fidelity performed substantially equal work. *See Brewster v. Barnes*, 788 F.2d 985 (4th Cir.1986); *Houck v. Virginia Polytechnic Inst.*, 10 F.3d 204, 206 (4th Cir.1993) (comparison must be made "factor by factor with the male competitor").

*las* framework in analyzing wrongful discharge claim under NCEEPA). Accordingly, Bayles wrongful discharge claim based on sex discrimination in connection with her termination survives summary judgment. However, Fidelity is entitled to judgment with respect to Bayles' wrongful discharge claim based on age discrimination.

## CONCLUSION

For the foregoing reasons, the court will grant Defendant's motion for summary judgment in part and deny it in part.