**Benjamin C. GARRETT, III &
Kathryn Salyer, Plaintiffs,**

v.

**LANGLEY FEDERAL CREDIT
UNION, et al., Defendants.**

Nos. Civ.A. 4:99CV63, Civ.A. 4:99CV62.

United States District Court,
E.D. Virginia,
Newport News Division.

Nov. 13, 2000.

Erika Louise Winter, D.R. Dansby, Ltd., Williamsburg, VA, for Kathryn A. Salyer, plaintiff.

William Vinton Hoyle, Jr., Hoyle & Associates, Newport News, VA, for Ben C. Garrett, III, consolidated plaintiff.

Stephen Wainger, Huff, Poole & Mahoney, Virginia Beach, VA, Constantinos George Panagopoulos, Ballard, Spahr, Andrews & Ingersoll, Washington, DC, F. Joseph Nealon, Ballard, Spahr, Andrews and Ingersoll, Washington, DC, Jeffrey W. Larroca, Ballard Spahr Andrews & Ingersoll, LLP, Washington, DC, for Langley Federal Credit Union, defendant.

Stephen Wainger, Constantinos George Panagopoulos, F. Joseph Nealon, Jeffrey W. Larroca, Ballard Spahr Andrews & Ingersoll, LLP, Washington, DC, for Peter A. Morley, Individually and as Agent, Servant and Employee of Langley Federal Credit Union, defendants.

## OPINION AND ORDER

DOUMAR, District Judge.

Presently before the Court are Defendants' Motions for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' Motions for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART**.

### I. *Procedural and Factual Background*

This action involves two consolidated cases: Benjamin C. Garrett, III v. Langley Federal Credit Union, Jean Yokum, and Peter Morley, 4:99cv63; and Kathryn Salyer v. Langley Federal Credit Union, Jean Yokum, and Peter Morley, 4:99cv62. Plaintiffs, Garrett and Salyer, allege violations of the whistleblower provision of the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1790b, and pendent state law claims for tortious interference with contractual relations, or in the alternative, fraud and misrepresentation.

### A. Plaintiff Benjamin C. Garrett, III

Defendant, Langley Federal Credit Union ("LFCU"), hired the Plaintiff, Benjamin C. Garrett, III ("Garrett"), in June of 1989. *See* Garrett Am.Compl. at ¶ 8. In January of 1999, during the pertinent time period at issue, Garrett was Vice President of Operations for LFCU. *See id.* On January 13, 1999, Garrett met with National Credit Union Administration ("NCUA") examiner Betty Myers ("Myers") as part of her examination of LFCU. *See id.* at ¶ 15. During this meeting, Garrett alleges that he informed Myers, after she promised him confidentiality and anonymity, of several concerns that he had with LFCU management and business practices. *See id.* at ¶ 16. Defendants, however, through Myers' deposition, state that Myers offered no such promise of confidentiality or anonymity to Garrett. *See* Myers Dep. at 49:2–20.

Specifically, Garrett told Myers that he was concerned that another employee, Barbara Elvington ("Elvington"), had unlimited access to confidential information and accounts of LFCU even though Elvington and members of her family suffered from personal financial problems. *See* Garrett Am.Compl. at ¶ 18(a). Garrett was also troubled that Elvington had previously served as the internal auditor at LFCU and answered directly to LFCU's President, Defendant Jean Yokum ("Yokum"), even though Elvington's job duties required her to audit and, if necessary, formally criticize Yokum. *See id.* at ¶ 18(b). In addition, Garrett was concerned that Elvington's prior position as internal auditor required her to be in charge of software conversion undertakings, which gave her absolute access to accounts, passwords, records, and other internal mechanisms at LFCU. *See id.* at ¶ 18(c). In Garrett's opinion, this position gave Elvington the power to conceal improper transactions, if any occurred. *See id.* Further, Garrett admits in his deposition that he reported a rumor he had

heard to Myers. *See* Garrett Dep. at 163–65. The rumor was that Yokum had paid off Elvington's credit card debt. *See id.* Interestingly, after holding the position of internal auditor, Elvington was promoted to Personal Assistant to the President, at a higher wage.

## B. Plaintiff Kathryn Salyer

In April of 1997, LFCU hired the Plaintiff, Kathryn Salyer ("Salyer"), after she produced an allegedly award-winning Annual Report for LFCU on an independent contractor basis. *See* Salyer Am.Compl. at ¶ 8; Salyer Aff. at ¶ 3. In January of 1999, the pertinent time period at issue, Salyer was Vice President of Marketing for LFCU. *See* Salyer Am.Compl. at ¶ 9. On January 12, 1999, Salyer met with Myers as part of Myers' examination of LFCU. *See* Ex. G to Defs.' Mem.Supp.Summ.J. ag. Salyer's Compl. at 1. During her meeting with Myers, in which Salyer alleges that Myers promised her confidentiality and anonymity, Salyer informed Myers of several concerns that she had regarding the credit union's management and business practices. *See* Salyer Am.Compl. at ¶ 16. Again, LFCU denies, through Myers' deposition, that any promises of confidentiality or anonymity were given to Salyer. *See* Myers Dep. at 47–48.

Specifically, Salyer told Myers that she was concerned that Elvington, who had personal financial problems, including a credit card that was revoked, possessed unlimited access to LFCU accounts and that no one, including the current internal auditor, Valerie Clark, had access to Elv-ington's account. Further, Salyer told Myers that the current internal auditor, Clark, had little training in NCUA audit procedures, no access to certain LFCU accounts, and no direct access to the Board of Directors. *See* Salyer Am.Compl. at ¶ 18(b). Salyer also reported that she was concerned about the level of LFCU's Y2K preparedness. *See id.* at ¶ 18(d). Finally, Salyer admits in her deposition that she reported a rumor to Myers that Yokum had paid off the credit card debt of Elvington.[1]

## C. Events Occurring After Myers Met with Garrett and Salyer

On January 19, 1999, Myers met with the Chairman of LFCU's Board of Directors, Peter Morley ("Morley"), as part of her examination of the insured credit union. *See* Ex. H. to Defs.' Mem.Supp. Summ.J. ag. Garrett's Compl. at 7. During this meeting, Myers relayed to Morley several employees' concerns regarding the management of LFCU. *See id.* Among other concerns, Myers reported to Morley that employees were troubled that LFCU was run by a "management by one" and comprised a "dysfunctional family," management accorded preferential treatment to certain favored employees, and that management had instructed LFCU vice presidents to not discuss the credit union's operations or their concerns with members of the Board of Directors. Moreover, Myers reported to Morley that two people had informed her of a rumor circulating at LFCU that Yokum had paid off the credit

---

1. *See* Salyer Dep. at 273:12–20. Defendant states, through Yokum's deposition, that in the fall of 1998, Salyer allegedly overheard a conversation between Ward and Garrett in which the two men were discussing a rumor that Yokum had paid off the credit card debt of Elvington. *See* Yokum Dep. at 32–35. Defendants maintain that Salyer reported to Yokum that she had overheard this conversation, and then she confronted Yokum about the rumor. *See id.* Defendants allege that when Yokum heard this information, she wanted to confront the two men and dispel the false rumor, but that Salyer said "[p]lease don't do that ... I'm talking to you in confidence." *Id.* at 33. At this time, Yokum states that she informed Salyer that the rumor was false and that she had not paid off anybody's credit card debt. *See id.* Further, Yokum states that an investigation was made into her allegedly paying off the credit card debt of Elvington and that the investigation concluded with the determination that Yokum had not paid off Elvington's credit card debt. *See id.* at 38.

card debt of one employee, Elvington. *See id.*

Myers states in her deposition that Morley "indicated that he could pretty much guess" which two employees told her the rumor that Yokum had paid off Elvington's credit card debt. *See* Myers Dep. at 92–93. The complete conversation regarding the identification of the individuals who reported the rumor is therefore important to detail. At Myers' deposition, her testimony was as follows:

Q: Did you and Mr. Morley ever have any discussion regarding any vice president reporting to you that Jean Yokum had paid off Barbara Elvington's credit card?

A: I believe, at some point in my discussions with Mr. Morley, we may have touched upon it. If I said anything about it, it would be to the effect that we, as a regulatory agency, can not dictate to a CEO how she uses her personal funds.

Q: Did you identify for Mr. Morley who had raised that issue?

A: No, I did not.

Q: Did Mr. Morley indicate that he knew who had raised that issue?

A: At our meeting that we had, I went over various things that various VPs had discussed with me. He kind of indicated that he could pretty much guess which ones may have indicated these things.

Q: Did [Morley] tell you who he had pretty much guessed reporting those things?

A: Yes, he did.

Q: Who did he identify?

A: He identified both Kathryn [Salyer] and Ben Garrett.

Q: Did he identify Mr. Ward at all?

A: Not to the best of my recollection, no.

. . .

Q: [D]id you acknowledge or affirm Mr. Morley's identification of Ben Garrett and Kathryn Salyer in any way during your meeting with him or at any time?

A: During the meeting with Mr. Morley, he asked me if I would identify those people. I stated that I would not. He said, 'If I provide you with names, would you tell me?'—I believe his terminology was something to the effect—'if I'm in the right ballpark?' He mentioned names and I believe I may have answered yes, he has very close in the right ballpark.

Myers Dep. at 92–95. By acknowledging that Morley's identification of Garrett and Salyer were "very close in the right ballpark," it is clear that Myers' statement is tantamount to reporting the identities of the two individuals.

Morley states in his deposition that he called Myers on the telephone after they met and that she told him the names of the two pertinent individuals. *See* Morley Dep. at 13–14 & 25. In fact, his testimony was as follows:

Q: When did Mrs. Myers tell you they shared this information with her?

A: I don't remember the date. I called Mrs. Myers at her home.

Q: Why did you call Mrs. Myers at her home?

A: Because I knew we were going to have the meeting and I wanted her to tell me if she would or if she could [sic] the two names that she gave me.

Q: I'm not understanding your answer. You said tell her the two names that she gave you?

A: Over the phone, yes, ma'am.

Q: So you heard these first—these two names when?

A: Over the phone, I called Mrs. Myers and asked her if she would give me the names of the two people who told her Mrs. Myers had paid off—I mean, excuse me, Mrs. Yokum had paid off Mrs. Elvington's credit card.

Q: How many days was that before the February 1st, 1999, meeting?

A: I don't remember.

Q: Was it more than a week before?

A: No.

Q: Was it more than three days before?

A: I don't remember specifically but I know it was within a week.

Q: Was it closer to a full week or close to a day?

A: I don't remember.

. . .

Q: When you called Mrs. Myers to ask her for the names, what did she say?

A: She said sure, and gave those names to me.

Q: That was the first time she had given you those names?

A: Yes, ma'am.

Morley Dep. at 13–14 & 25.

Myers denies that she told Morley this information over the telephone, however. *See* Myers Dep. at 51.

After speaking with Myers, Morley then met with Yokum to discuss Myers' examination of LFCU. Yokum told Morley at this meeting that she had not paid off Elvington's credit card debt and that any such rumor was false. *See* Yokum Dep. at 37. Yokum explained to Morley that Salyer had approached her in the fall of 1998 after overhearing a conversation between Garrett and Ward in which the two men were discussing the rumor that Yokum had paid off Elvington's credit card debt. *See* Morley Dep. at 110–11. Yokum told Morley that she had instructed Salyer in 1998 that the rumor was false. *See* Morley Dep. at 115. Although Salyer's affidavit does not state that Yokum denied this allegation, *see* Salyer Aff. at ¶ 1, Salyer does state in her deposition that Yokum told her in 1998 that she "had not paid off anybody's credit card." Salyer Dep. at 231:21–24. After Yokum met with Morley and learned that Garrett and Salyer had informed Myers of a rumor that Yokum had paid off Elvington's credit card debt, Yokum visited Garrett's office to inquire whether he had told anyone that she had

paid off Elvington's credit card. *See* Garrett Dep. at 206:5–8. Garrett denied this fact to Yokum. *See id.*

On February 1, 1999, Yokum and Morley met with Garrett, Salyer, and James Ward ("Ward"), who was then Vice President of Human Resources. *See* Garrett Dep. at 209–10. Yokum and Morley met with each of these three individuals together and then separately. *See id.* at 216. During Garrett's separate meeting, he alleges that he denied to Yokum and Morley that he told the examiner that Yokum had paid off Elvington's credit card debt. *See id.* at 216:18–21. However, when asked whether he had told Myers that he had heard a rumor that Yokum had paid off Elvington's credit card debt, Garrett states that he told Yokum and Morley that he could not remember and that he wanted to check his notes before responding. *See id.* at 216:21–23. After checking his notes, Garrett admitted to Morley and Yokum that he did tell Myers that he had heard a rumor that Yokum had paid off Elvington's credit card debt. *See id.* at 217–18. Thus, Garrett admits that he told Myers about the rumor at LFCU that Yokum had paid off Elvington's credit card debt, but he denies that he advocated that the rumor was true. When Morley and Yokum met separately with Salyer on February 1, 1999, Salyer states in her deposition that she cannot remember if she admitted to them during this meeting that she had told Myers the rumor that Yokum had paid off Elvington's debt. *See id.* at 300:7–16.

On February 5, 1999, Yokum offered Garrett the opportunity to retire, resign, or be terminated from his position with LFCU. *See id.* at 232:3–22. On that date, Garrett retired from the credit union. *See id.* On February 5, 2000, Yokum offered Salyer the opportunity to resign or be terminated from her position with LFCU. *See id.* at 305:7–12. On that date, Salyer refused to resign, and as a result, she was terminated. *See id.* at 307:21–24.

## II. *Legal Analysis*

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that "[i]n such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991).

### B. Overview of Relevant Sections of the FCUA

As stated in the FCUA, federal credit unions fall under the supervision of the National Credit Union Administration Board ("the Board"). *See* 12 U.S.C. § 1756. Credit unions are obligated to make financial reports to the Board as the Board requires, but at least annually. *See id.* Further, every federal credit union shall be subject to examination by any person designated by the Board. *See id.* The Board is granted specific power to prescribe rules and regulations for the administration of credit unions, including the power to "suspend or revoke the charter of any federal credit union, or place the same in involuntary liquidation." 12 U.S.C. § 1766(b)(1). Moreover, the Board

> is authorized and empowered to execute any and all functions and perform any and all duties vested in them hereby, through such persons as it shall designate or employ; and it may delegate to any person or persons, including any institution operating under the general supervision of the administration, the performance and discharge of any authority, power, or function vested in them by this chapter.

12 U.S.C. § 1766(d).

The FCUA also gives the Board the authority to "appoint examiners who shall have power, on its behalf, to examine any insured credit union." 12 U.S.C. § 1784(a). Each examiner is charged with the duty and the power to "make a thorough examination of all of the affairs of the credit union and [to] make a full and detailed report of the condition of the credit union to the Board." *Id.* This statutory provision further permits the examiners to apply to courts for orders enforcing subpoenas when, in the course of an examination, information and documents are not forthcoming and to seek other judicial relief in order to facilitate the work of the examiners for the Board. *See id.* In fact, the Board's examiners have the power to issue subpoenas, to take and preserve testimony, and to deal with other matters necessary to implement the intention that the affairs of the credit union be regularly subjected to scrutiny and oversight. *See id.* Finally, the FCUA provides that

> [w]henever, in the opinion of the Board, any insured credit union is engaging or has engaged in unsafe or unsound practices in conducting the business of such

credit union, or is in an unsafe or unsound condition to continue operations as an insured credit union, or is violating or have violated an applicable law, rule, regulation, order or any condition imposed in writing by the Board ... the Board shall serve upon the credit union a statement with respect to such practices or conditions or violations for the purpose of securing the correction thereof.

12 U.S.C. § 1786(b)(1).

## C. Count One: Retaliatory Termination in Violation of 12 U.S.C. § 1790b(a)(1)

### 1. Individual Liability Under 12 U.S.C. § 1790b(a)(1)

■ At the hearing on Defendants' Motions for Summary Judgment, the Plaintiffs waived their argument that Defendants Yokum and Morley are personally liable for any alleged violation of the whistleblower provision under 12 U.S.C. § 1790b(a)(1). As such, this Court holds that Defendants Yokum and Morley are not liable in their individual capacity under Count One of Plaintiffs' Complaints. This Court notes, however, that based on the statutory language of 12 U.S.C. § 1790b(a)(1), LFCU is a proper Defendant.

### 2. Whether Plaintiffs Should Receive Whistleblower Protection Under 12 U.S.C. § 1790b(a)(1)

One of several federal "whistleblower" statutes, the FCUA provides, in pertinent part, that

[n]o insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee ... provided information to the Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

12 U.S.C. § 1790b(a)(1). If a federal credit union violates § 1790b(a)(1), the aggrieved employee may bring suit in the appropriate United States District Court to gain reinstatement to her former position, compensatory damages, or other "appropriate actions to remedy any past discrimination." 12 U.S.C. § 1790b(c). The protection afforded to employees under § 1790b does not apply, however, if the employee has either (1) deliberately caused or participated in the alleged violation of law or regulation, or (2) knowingly or recklessly provided substantially false information to the Board or the Attorney General. See 12 U.S.C. § 1790b(d).

As the First Circuit noted in *Simas v. First Citizens' Federal Credit Union*, 170 F.3d 37 (1999), "the case law interpreting section 1790b itself is extremely sparse." As such, the First Circuit directed that courts faced with the task of interpreting § 1790b should look to case law construing similarly-phrased anti-retaliation provisions in other federal employment discrimination statutes. *See id.* at 43 (suggesting that courts look to Title VII, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and other federal whistleblower statutes when interpreting a case under the FCUA whistleblower provision). This reliance on comparably-phrased statutes is necessary in analyzing the case at bar because § 1790b contains no explicit burden of proof allocation.

■ In *Simas*, the First Circuit noted that many federal anti-retaliation statutes require plaintiffs to prove a three-part prima facie case. *See id.* at 44. First, the Plaintiffs must demonstrate that they engaged in a protected activity, which in this case consists of providing information to the Board "regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union." *See id.; see also* 12 U.S.C. § 1790b(a)(1). Next, the Plaintiffs must demonstrate that LFCU subjected them to some materially adverse employ-

ment action. *See id.* Finally, Garrett and Salyer must show that a causal connection existed between the protected activity and the adverse action. *See id.* It is important to note that the Plaintiffs' burden of proving a prima facie case is not an onerous one. *See id.*

■ LFCU contends that Plaintiffs are not able to demonstrate the first element of the prima facie case. Specifically, LFCU argues that Plaintiffs cannot prove that they provided information to the Board, through its examiner Myers, regarding "any possible violation" of a law or regulation by the credit union or any officer, director, or employee of the credit union. In response, Plaintiffs argue that LFCU is a federally insured credit union that would violate the law or regulation if it engaged in "unsafe or unsound business practices." Plaintiffs cite to numerous sections of Title 12 of the United States Code for this proposition, including 12 U.S.C. §§ 1781(c)(2), 1786(b)(1), and 1786(e)(1). Thus, it is necessary to review the language of these provisions to determine whether they are applicable to the case at bar.

12 U.S.C. § 1781(c)(2) provides that the Board "shall disapprove the application of any credit union ... if it finds that its ... policies are unsafe or unsound...." Section § 1786(b)(1) states that if the Board decides that "any insured credit union is engaging or has engaged in unsafe or unsound business practices" while conducting its business, the Board "shall serve upon the credit union a statement with respect to such practices or conditions or violations for the purpose of securing a correction thereof." Finally, § 1786(e)(1) provides that if the Board determines that an insured credit union is engaging, has engaged, or is about to engage in an unsafe or unsound practice, or is violating, has violated, or is about to violate a law, rule,

or regulation, "the Board may issue and serve upon the credit union or such party a notice of charges in respect thereof." Thus, the Plaintiffs contend that they reported "unsafe or unsound" business practices when they spoke with Myers and as such, they argue that they deserve protection under § 1790b(a)(1) because they provided information regarding "any possible violation" of a law or regulation.

On its own review of the regulations pertaining to insured credit unions, this Court was able to identify two regulations that generally apply to the case at bar. 12 C.F.R. § 704.15 sets forth the normal reporting procedures for an individual in the position of internal auditor.[2] This regulation states that an internal auditor

> will report directly to the chair of the corporate credit union's supervisory committee, who may delegate supervision of the internal auditor's daily activities to the chief executive officer of the corporate credit union. The internal auditor's reports, findings, and recommendations will be in writing and presented to the supervisory committee no less than quarterly, and will be provided upon request to the external auditor and NCUA.

This regulation is therefore relevant because one of the concerns that the Plaintiffs expressed to Myers during her examination was that Elvington, who had previously served as the internal auditor at LFCU, answered directly to Yokum while serving in that position even though her job responsibilities required her to audit and criticize Yokum, if necessary. *See* Garrett Am.Compl. at 18(b). If Elvington, while serving in the position of internal auditor, reported directly to Yokum and not the chairman of the supervisory committee, this violates the accepted chain of command in which internal audi-

---

**2.** The Court is well aware that this regulation pertains specifically to corporate credit unions, however, it is useful because it states, in general, the reporting duties of the internal

auditor of a credit union and sets forth the appropriate chain of command that should be followed by an individual in the internal auditor position.

tors are to engage.[3] Indeed, attached as an exhibit to Garrett's brief in opposition is a 1994 memorandum written by Yokum to all LFCU vice presidents and the internal auditor instructing them that "[t]he President is directly responsible to the Board of Directors for the day-to-day operations. The Vice Presidents and Internal Auditor are directly responsible to the President for managing their respective areas.... If you do not agree and cannot conform to these policies, you need to seek employment elsewhere." Ex. 8 to Garrett's Mem.Opp.Summ.J. Moreover, Myers states in her deposition that upon completion of her examination of LFCU, she "recommended that the internal auditor report directly to the supervisory committee" and that LFCU agreed with her to either correct or review its practice based on the internal auditor's current reporting directives. Myers Dep. at 102–04. Thus, in reporting to Myers the fact that Elvington, while serving in the position of internal auditor, reported directly to Yokum, the Plaintiffs may indeed have provided information regarding a "possible violation" of a regulation. The Court emphasizes that the whistleblower statute employs the word "possible."

The second pertinent regulation the Court discovered on its own, 12 C.F.R. § 703.120, provides that a federal credit union's officials and employees "must conduct all transactions with business associates or family members that are not specifically prohibited by paragraph (a) of this section at arm's length and in [the credit union's] best interest." This provision is relevant because the Plaintiffs were concerned that the rumor regarding Yokum paying off Elvington's credit card debt, if true, may have been a transaction not in the credit union's best interest as it demonstrates favoritism between management and certain employees.

Although this regulation does not explicitly define the term "business associates," it is undeniable that this term encompasses those individuals with whom we associate and engage in business relationships, such as partners, fellow employees, or colleagues, working toward the same cause. See Webster's Third New International Dictionary 132 (1981) (stating that the noun "associate" means "one who shares with another an enterprise, business, or action: a fellow worker" and that the verb "associate" means "to join often in a loose relationship as a partner, fellow worker, colleague, friend, companion, or ally"). In fact, courts have determined that the term "associate," although undoubtedly having among its meanings that of "partner," does not indicate a partnership conclusively because a mere employee may be an "associate" of his employer. See Alleghany Corp. v. James Found. of N.Y., Inc., 115 F.Supp. 282, 296 n. 20 (1953); see also Weir v. United States, 92 F.2d 634, 638 (1937) (stating that "[t]he word 'associate' is not of uniform meaning but is, rather, vague in its connotation. In ordinary nomenclature it signifies, to connect closely or join with others in a common purpose, activity, or responsibility, to partake or share in a common design. It implies participation

---

3. This Court finds it interesting to note that on August 18, 1997, Elvington received a promotion to the position of Assistant to the President. See Ex. 14 to Pl. Garrett's Mem. Opp.Summ.J. The promotion, in turn, increased her salary. See id. At the time of Myers' examination of LFCU, Valerie Clark served as the internal auditor. In Myers' confidential memorandum written to Regional Director Tawana James and James Raney, she states that she held several meetings with Clark and read various reviews completed by the internal auditor. See Ex 5 to Pl. Garrett's Mem.Opp.Summ.J. at 6. Further, during these meetings, Myers states that she and Clark discussed who Clark reported to and that she determined that Clark "primarily reports to the Supervisory Committee and coordinates her work schedule with the committee." See id.

Thus, it may be the fact that when Elvington occupied the position of internal auditor, she improperly reported directly to Yokum and not the chairman of the supervisory committee. This practice may or may not have ended as Clark and Myers indicate that Clark "primarily" reported directly to the chairman of the supervisory committee.

by each of the individuals, so united, in the achievement of a common purpose. In its general and ordinary sense it is said to signify confederacy or union for a particular purpose, good or ill, without any uniform discrimination as to precise meaning").

Under this definition, Yokum and Elvington may be regarded as business associates. Therefore, when both Garrett and Salyer reported a rumor to Myers that Yokum had paid off Elvington's credit card debt, the Plaintiffs did in fact report information "regarding any possible violation of any law or regulation." As a result, this Court need not determine whether the statutory provisions to which the Plaintiffs cite, including 12 U.S.C. §§ 1781(c)(2), 1786(b)(1), and 1786(e)(1), fall within the parameters of the whistleblower provision of the FCUA and apply to the case at bar.

Thus, Plaintiffs are able to demonstrate that they engaged in a protected activity when they reported their concerns to Myers, a NCUA examiner. As a result, this Court must evaluate the two remaining requirements necessary for Plaintiffs to prove a prima facie case. Again, the second part of Plaintiffs' prima facie case requires them to demonstrate that LFCU subjected them to a materially adverse employment action. *See Simas*, 170 F.3d at 44.

■ Specifically, the FCUA expressly prohibits a federal credit union from engaging in two different types of retaliatory employment action. The first is an actual or constructive discharge, *see Simas*, 170 F.3d at 46, and the second is other "discriminat[ion] . . . with respect to compensation, terms, conditions, or privileges of employment." 12 U.S.C. § 1790b(a)(1). Garrett alleges that Yokum presented him with the option of resignation or termination on February 5, 1999. *See* Garrett Am.Compl. at ¶ 28. After calling his attorney, Garrett alleges that he opted to retire. *See id.* As such, Yokum ended his employment that same day. *See id.* at ¶ 29. LFCU admits, in its Answer to Garrett's Amended Complaint, that Yokum terminated Garrett's employment on February 5, 1999. *See* Answer to Garrett's Am.Compl. at ¶ 29. Salyer alleges that Yokum presented her with the option of resignation or termination on February 5, 1999, as well. *See* Salyer Am.Compl. at ¶ 28. Salyer further alleges that she refused to resign and as a result, Yokum terminated her employment with LFCU on the same day. *See id.* at ¶¶ 28–29. Defendants admit that Yokum terminated Salyer's employment with LFCU. *See* Answer to Salyer's Am.Compl. at ¶ 29. As such, both Garrett and Salyer have demonstrated to this Court that LFCU subjected them to a materially adverse employment action.

■ The final remaining obstacle for the Plaintiffs to meet in demonstrating a prima facie case under the FCUA's whistleblower provision is to demonstrate that a causal connection exists between the Plaintiffs' protected activity and the adverse employment action taken against them. *See Simas*, 170 F.3d at 44. The *Simas* court noted that under some anti-retaliation statutes, a plaintiff's prima facie burden on this causation element is eased, requiring only a showing that the protected activity was a "contributing factor" in the adverse action, not necessarily its substantial or motivating cause. *See id.* (citing *Frobose v. American Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 612 (7th Cir.1998). In *Simas*, unlike the case at bar, the parties had acceded to this lesser standard at the district court level and therefore, the appellate court adopted that standard to apply throughout the pendency of the case. *See id.* Even employing the heightened standard above, this Court finds that it is clear that a causal connection exists between Plaintiffs' termination from their employment at LFCU and their provision of information to Myers regarding the conduct and policies of LFCU officers, including the supposed rumor that Yokum paid off Elvington's credit card debt.

After Garrett and Salyer have established a prima facie case, a presumption of retaliation arises and the burden shifts to LFCU to articulate a legitimate nondiscriminatory rationale for its actions. *See id.* LFCU argues that the reason it fired Garrett was because he told Myers that Yokum had in fact paid off Elvington's debt and that Yokum believed that Garrett lied to Yokum about that issue when she met with him individually before February 5, 1999. *See* Defs.' Mem.Supp.Summ.J. ag Garrett's Compl. at 18. In relation to Salyer, LFCU argues that Salyer was fired "because she imparted information to the examiner she knew to be false—that Ms. Yokum had made payments on the accounts of favored employees, including Ms. Elvington—and because she apparently lied about overhearing Mr. Ward and Mr. Garrett discussing the rumor in the fall of 1998." Defs.' Mem.Supp.Summ.J. ag. Salyer's Compl. at 12. As such, LFCU argues that neither Garrett nor Salyer have "one scintilla of evidence" to demonstrate that they were asked to retire or were fired under any other rationale. The Court disagrees.

This Court recognizes that the burden of demonstrating a legitimate nondiscriminatory reason is similarly not an onerous task. In fact, LFCU need only articulate, not prove, a nondiscriminatory motive for their actions. As such, this Court finds that LFCU has met its burden of articulating a legitimate nondiscriminatory rationale for terminating the Plaintiffs' employment: that they lied to their employer. *See EEOC v. Total Servs. Inc.,* 221 F.3d 1171, 1176 (11th Cir.2000) (stating that the defendant offered a legitimate nondiscriminatory reason for the plaintiff's termination in that the defendant concluded that the plaintiff had lied in an internal investigation); *see also Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (noting that the pertinent inquiry is not whether the employee was guilty of misconduct, but whether the employer believed that its employee had done wrong and whether this belief was the reason for the termination).

Once this burden has been met, the initial presumption of retaliation disappears, and Garrett and Salyer must then bear the burden of proving, by a preponderance of the evidence, that the Defendant's nondiscriminatory motive is pretextual and that the real motive was the Plaintiffs' decision to provide Myers with information regarding a possible violation of law or regulation. *See Simas,* 170 F.3d at 44. In short, the Plaintiffs must demonstrate that LFCU's proffered reason was a mere pretext and that, as between the fact that the Plaintiffs reported information to Myers regarding possible violations of regulations and LFCU's explanation, the Plaintiffs provision of information to Myers was the more likely reason for their dismissal. *See Herold v. Hajoca Corp.,* 864 F.2d 317, 319 (4th Cir.1988) (citing *EEOC v. Western Elec. Co.,* 713 F.2d 1011, 1014 (4th Cir.1983)).

To survive a motion for summary judgment under the pretext analysis, it is clear that the Plaintiffs must do more than merely raise a jury question about the veracity of LFCU's proffered justification. Instead, Garrett and Salyer must have developed some evidence on which a juror could reasonably base a finding that retaliation motivated the challenged employment action. *See Vaughan v. Metrahealth Co., Inc.,* 145 F.3d 197, 202 (4th Cir.1998). Although LFCU maintains that Garrett told Myers that Yokum had in fact paid off Elvington's credit card debt, Garrett consistently denies this accusation. In his deposition, Garrett states that he merely reported to Myers that he had heard "a rumor" that Yokum had paid off Elvington's debt. *See* Garrett Dep. at 163–65. When asked in his deposition whether he had told Myers that the rumor was true, Garrett replied that he did not. *See id.* Further, when Yokum later confronted Garrett about whether he had told Myers that she had paid off Elvington's debt, he also denied this accusation. *See*

*id.* at 206:5–8. At Garrett's later meeting with Morley and Yokum, he again denied that he had told Myers that Yokum had paid off Elvington's debt. *See id.* at 216:18–21. Garrett did admit to Morley and Yokum, however, that he had told Myers that "a rumor" existed concerning Yokum paying off Elvington's credit card debt. *See id.* at 217–18. The question of the truth then is whether there was such a "rumor," not whether the rumor was true.

With regard to Salyer's case, LFCU insists that she was fired because she told Myers that Yokum had made payments on Elvington's account even though she knew such information to be false. LFCU bases its rationale on the fact that Yokum had previously denied the veracity of the rumor in 1998 to Salyer when Salyer confronted Yokum after allegedly overhearing a conversation between Garrett and Ward in which the two men were discussing the rumor. However, Salyer only admits in her deposition that she told Myers that there was "a rumor" that Yokum had paid off the credit card debt of Elvington. *See* Salyer Dep. at 273:12–20. At no time does Salyer admit, in the profferred portions of the deposition, that she told Myers that Yokum had in fact paid off the credit card debt of Elvington—the only information she passed on was that such a "rumor" existed. Again, the question is whether there was such a "rumor," not whether the rumor was true.

Furthermore, LFCU argues that Garrett and Salyer's "attempt[s] to craft a retaliation case by claiming that it was [their] report of alleged possible violations of law or regulation that resulted" in their termination are illogical because Ward, who at the time served as Vice President of Human Resources, also told Myers about the rumor that Yokum had paid off Elvington's debt, yet Ward suffered no adverse employment action for such action. Instead, Ward left LFCU voluntarily after Myers' examination because his "advancement avenue had dried up." *See* Ward Dep. at 64:12–13. Thus, LFCU essentially

argues that because it took no adverse employment action against Ward for reporting the rumor to Myers, this also demonstrates that it took no adverse employment action against Garrett or Salyer for the same reason. This logic, however, is flawed and lends credence to the Plaintiffs' contention that LFCU's rationale for firing them was pretextual. In actuality, Ward only admitted in his deposition that he told Myers about the rumor regarding Yokum paying off Elvington's credit card debt. *See id.* at 53–54. He never told Yokum or Morley that he had repeated this rumor to Myers. In Ward's deposition, he explains the conversation he had with Morley regarding what he told Myers:

When I was called back into the room, I was in the room with [Yokum] and Pete Morley by myself. I don't remember whether he asked me [what I said to Myers] specifically, but I remember asking him was I being accused of having told Betty Myers that [Yokum] had paid off [Elvington's] credit card. . . . I asked him if I was being accused of having said that [Yokum] had paid off [Elvington's] credit card. He said, no, absolutely not. Betty Myers said that you didn't say anything like that.

*Id.* at 57. Thus, it is clear from Ward's deposition testimony that he did in fact tell Myers that he had heard a rumor that Yokum had paid off Elvington's credit card. However, the fact that LFCU fails to point out in support of its argument is that neither Morley nor Yokum were aware of that fact at the time that Garrett and Salyer were fired.

This Court finds that, based on the evidence presented above, a juror could reasonably determine that discrimination motivated the termination of Plaintiffs' employment from LFCU. Moreover, a genuine issue of material fact exists regarding exactly what the Plaintiffs told Myers in their conversations with her. Garrett and Salyer both consistently deny that they told Myers that Yokum had in fact paid off Elvington's credit card debt.

Instead, both admit that they relayed to Myers that there was "a rumor" circulating that Yokum had paid off Elvington's debt. As such, it would be hasty for this Court to decide at the summary judgment stage that the Plaintiffs have not demonstrated that the Defendant's articulated rationale for the Plaintiffs' termination from employment at LFCU is a mere pretext for unlawful retaliation.

More importantly, LFCU's conduct is precisely what Congress sought to target when it enacted the FCUA's credit union employee protection remedy. As the *Simas* court concluded, "[i]f nothing else, Congress intended that section 1790b deter federal credit unions from expressly dissuading their employees in exercising the statutory right to report suspected regulatory violations." Therefore, to hold that the Plaintiffs are not protected under this statute would send a disturbing message to all employees of federal credit unions: refrain from relating any information to a federal examiner regarding possible violations of law or regulation unless you have absolute proof that the credit union, its employees, officers, or directors violated a law or regulation or you plan to seek new employment immediately. Moreover, to hold otherwise would defeat the essential purpose of the whistleblower protection provision of the FCUA. The Court finds that, under the limited evidence presented to it, Myers' conduct in this particular instance was reprehensible. Her function is to protect the credit union's depositors, not the credit union's officers. It is clear that if the Plaintiffs' positions are true, Myers' priorities unfortunately were reversed in the instant case.

 LFCU further attempts to derail Plaintiffs' claim under the whistleblower provision of the FCUA by invoking one of the statutory defenses set forth in the statute. As stated above, 12 U.S.C. § 1790b(d) provides that the protections of the whistleblower section of the Act do not apply to "any employee who—(2) knowingly or recklessly provides substantially false information" to a federal examiner. The "false information" at issue is the rumor that Yokum paid off the credit card indebtedness of Elvington, the details of which both Garrett and Salyer informed Myers. The difference between the two plaintiffs is that Garrett had never spoken with Yokum directly about the alleged rumor, while Salyer admits that she had confronted Yokum with the rumor in the fall of 1998. In Yokum's conversation with Salyer, Yokum expressly denied the rumor. In her deposition, Salyer states that she cannot recall whether she informed Myers that Yokum had previously told her that the rumor was false.

By merely reporting their concerns to Myers, Plaintiffs' conduct should not be characterized as knowingly or recklessly providing false information to the examiner. In contrast, the two plaintiffs merely informed the examiner of "a rumor" that was circulating at LFCU, they did not advocate or insist upon the truth of the rumor. Moreover, the only information regarding the falsity of the rumor at the time was Yokum's own statement to Salyer that the rumor was not true. As such, § 1790b(d)(2) should not apply to bar Plaintiffs' claim under the whistleblower provision of the Act. Moreover, if reported as "a rumor," it appears that at least three officers were aware of the "rumor." As emphasized previously, the question is not whether the facts contained in the "rumor" were true, but whether there was a "rumor."

Based on the analysis above, this Court **DENIES** LFCU's Motions for Summary Judgment as to Count One of the Plaintiffs' Complaints.

### D. Doctrine of After–Acquired Evidence

In its Motions for Summary Judgment, Defendant argues that if this Court declines to grant summary judgment for Defendant on Salyer's whistleblower claim under 12 U.S.C. § 1790b(a)(1), it should instead limit Salyer's potential damage

recovery based on the doctrine of after-acquired evidence.[4] In response, the Plaintiffs argue that the doctrine of after-acquired evidence is inapplicable to whistleblower cases and that it would be error for this Court to conclude at the summary judgment stage that the doctrine of after-acquired evidence should apply to limit Salyer's claim for relief.

■ In *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the Supreme Court was faced with the issue of "whether all relief must be denied when an employee has been discharged in violation of the [Age Discrimination in Employment Act] and the employer later discovers some wrongful conduct that would have led to a discharge if it had been discovered earlier." *Id.* at 356, 115 S.Ct. 879. In answering this question, the Court held that after-acquired evidence of wrongdoing that would have resulted in the employee's termination did not bar all relief for an earlier violation of the ADEA, but instead operated to limit the relief available. *See id.* at 361–62, 115 S.Ct. 879. In so holding, the Court looked not only to the policy behind the enactment of the ADEA, but also to similar statutory schemes enacted to protect employees in the workplace nationwide, including Title VII, to bolster its determination. *See id.* at 357–58, 115 S.Ct. 879. In fact, the *McKennon* Court ultimately made it clear that its analysis applied not only to claims under the ADEA, but also to those under Title VII. *See id.* at 358, 115 S.Ct. 879 (noting the "common substantive features" and "common purpose" of the two statutory schemes). As the First Circuit in *Simas* directs courts to look to case law construing comparably-phrased anti-retaliation provisions in other federal employment discrimination statutes, including Title VII and the ADEA, to interpret the FCUA's whistleblower provision, this Court is of the opinion that just as the after-acquired evidence doctrine applies in cases under Title VII and the ADEA, it should apply under the FCUA's whistleblower protection provision.

■ Under *McKennon,* in order for an employer to invoke the defense successfully, "it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362–63, 115 S.Ct. 879. The "general rule" when a discriminating employer meets that burden is that "neither reinstatement nor front pay is an appropriate remedy." *Id.* at 361–62, 115 S.Ct. 879. Instead, the "beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id.* at 362, 115 S.Ct. 879.

■ This Court remains mindful that its function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Moreover, this Court must draw any permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Plaintiffs argue that it would be error to determine at the summary judgment stage that the doctrine of after-acquired evidence should apply as a matter of law to limit Salyer's damages. In support of this contention, the Plaintiffs cite *Russell v. Microdyne Corp.,* 65 F.3d 1229 (4th Cir.1995). In *Microdyne,* the Fourth Circuit determined that the trial court erred by concluding on summary judgment that the

---

**4.** The Defendant's argument regarding the doctrine of after-acquired evidence applies only to Salyer, not Garrett.

defense of after-acquired evidence applied as a matter of law. *See id.* at 1240. The *Microdyne* case, however, is distinguishable from the case at bar.

In *Microdyne,* the Fourth Circuit gave three reasons why the trial court erred. First, contradictory evidence existed in the record regarding whether the evidence was in fact newly acquired in the course of discovery. *See id.* Second, a genuine dispute existed regarding whether the plaintiff actually engaged in "misconduct" at all. *See id.* Finally, the evidence as to whether the misconduct would have caused the employer not to hire the plaintiff in the first place was unclear. *See id.* In addition to these reasons, it is important to note that *Microdyne,* unlike the case at bar, involved a failure to hire case in which the court determined that the plaintiff "did not suffer any immediate negative employment decision after [defendant's] alleged discovery of her [alleged misconduct]." *Id.*

In the instant case, a dispute arises as to whether Salyer engaged in some of the acts of misconduct that Defendant alleges. Defendant alleges that Salyer engaged in resume fraud, she failed to perform a 1998 membership satisfaction survey, she attempted to destroy documents relating to that member satisfaction survey, she took a trip awarded to the credit union without authorization, she took leave for jury duty when jury duty was canceled, she purchased personal items with her corporate credit card, and she procured United States Air Force stationery to forge an anonymous letter of complaint to LFCU's supervisory committee chairman. Defendant also states that Salyer's bond was revoked from the Credit Union Mutual Insurance Society (CUMIS), the same organization that insures LFCU, its directors, and employees against liability incurred as a result of illegal employment practices. Based on this evidence, the De-

fendant argues that it would have fired Salyer anyway when it learned of her transgressions. In regard to the revocation of Salyer's bond, however, Salyer argues that the only reason that CUMIS revoked her bond was because LFCU provided CUMIS with a memorandum alleging a "laundry list" of undocumented and unproven misconduct on the part of Salyer for the sole purpose of having her bond revoked.

This Court finds no need to address the merit of each of these separate incidents of alleged misconduct, because it is clear that contradictory evidence exists in the record concerning whether Salyer actually engaged in such conduct. What is clear, however, is that Salyer did admit in her deposition that she procured stationery from the United States Air Force at Ward's request so that he could draft an anonymous letter to LFCU management. *See* Salyer Dep. at 211–14. Salyer admits that she made a copy of the stationery from an original letter that she had received from the United States Air Force and gave it to Lori McCormick who "whited out" the words to create a blank piece of paper with only the signature, the Air Force label, and the address remaining on the paper. *See id.* This Court is of the opinion that a jury may reasonably conclude, depending on the evidence presented at trial, that such conduct on the part of Salyer was of such severity that she in fact would have been terminated on those grounds alone if LFCU had known of such information at the time of her discharge.[5] Based on this reasoning, this Court finds that the doctrine of after-acquired evidence should apply to the case at bar, and, depending on the jury's findings, potentially limit Salyer's recovery to a calculation of backpay from the date of the wrongful discharge to the date the new information was discovered.

---

5. *See McKennon,* 513 U.S. at 362–63, 115 S.Ct. 879. It is indicated, however, that one or more others may have participated in the false letter and stationery without suffering termination from their employment.

However, the Court is of the opinion that because of the possible limitation of damages, coupled with the question of punitive damages that may exist, this case should be bifurcated. That is, the jury should first determine liability and then, and only then, should the same jury determine an award of damages. Thus, the after-acquired evidence may not be used to determine liability and questions regarding punitive damages would keep out the value and earnings of LFCU unless liability is found to exist. However, portions of this evidence may be admissible in the liability aspects of the case, depending on its relevancy and materiality at the time, in the discretion of the trial judge.

### E. Tortious Interference with Contractual Relations

■ Garrett and Salyer both allege a tortious interference with contractual relations cause of action. In both Complaints, the Plaintiffs allege that Morley and Yokum conspired with Myers to "gain and use information obtained in violation of a promise of confidentiality to interfere with [Garrett and Salyer's] employment with LFCU." Garrett Am.Compl. at ¶ 41; Salyer Am.Compl. at ¶ 41. Specifically, Plaintiffs argue that Myers knew that she would not keep her promise of confidentiality and that she made the promise of confidentiality with the knowledge that the Plaintiffs would rely on it to their detriment. See Garrett Am.Compl. at ¶ 43; Salyer Am.Compl. at ¶ 43. Moreover, Plaintiffs allege that Myers acted in concert with Yokum and Morley to interfere "through improper means with [Garrett and Salyer's] contract and to induce a breach of Garrett's contract." Garrett Am.Compl. at ¶ 47; Salyer Am.Compl. at ¶ 47. As a result of this conduct, the Plaintiffs allege that they were harmed. See id.

■ In Virginia, a claim for tortious interference of contract must allege (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. See Perk v. Vector Resources Group, Ltd., 253 Va. 310, 485 S.E.2d 140, 143 (1997) (quoting Duggin v. Adams, 234 Va. 221, 360 S.E.2d 832, 835 (1987) and Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97, 102 (1985)). Moreover, Virginia law allows a tortious interference action to exist against those who conspire to induce a breach of contract. See Elliott v. Shore Stop, Inc., 238 Va. 237, 384 S.E.2d 752, 757 (1989). This rule may be applied to hold one liable along with an independent third party for conspiring to breach a contract. See id.

■ A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. See Werth v. Fire Adjust. Bureau, 160 Va. 845, 171 S.E. 255, 259, cert. denied, 290 U.S. 659, 54 S.Ct. 74, 78 L.Ed. 570 (1933). This Court notes that, in analogizing to the context of criminal actions, a conspiracy may be established if the conduct of the parties and the inferences to be drawn from such conduct indicate, at least, a "tacit understanding" to accomplish the object of the alleged conspiracy. See Wallace v. United States, 281 F.2d 656, 663 (4th Cir. 1960). It is clear that there is evidence in the record to support a finding that Morley and Yokum conspired with Myers to induce a breach of the Plaintiffs' employment relations with LFCU. Although Myers denies that she promised confidentiality and anonymity to the Plaintiffs, she does admit acknowledging to Morley that his belief that Garrett and Salyer told her the rumor that Yokum paid off Elvington's credit card debt was "very close in the right ballpark." Myers Dep. at 95. However, she denies expressly identifying Gar-

rett and Salyer by name. The Court finds it curious that Myers would refrain from stating the names of the two individuals if she gave no promise of confidentiality or anonymity to the Plaintiffs. In the reverse, if Myers did promise confidentiality and anonymity to the Plaintiffs, this Court finds it strange that Myers would tell Morley only that he was "in the right ballpark" after he named the two Plaintiffs as the individuals he thought had told Myers about the rumor involving Yokum. These conflicting scenarios amply demonstrate the odor that is permeating this case.

Moreover, it is abundantly clear that Myers must be attributed with the knowledge that by revealing the Plaintiffs' concerns about LFCU's management style and business practices to Morley and Yokum, coupled with the fact that she revealed their identities either expressly or implicitly, the natural result of her actions would be adverse to the Plaintiffs' employment. Clearly, any reasonable person would have understood this. In fact, the Fourth Circuit has held that in assessing the deliberateness of an individual's conduct, the individual "must necessarily be held to intend the reasonably foreseeable consequences of its actions."[6] Based on these facts, a reasonable juror could find that a conspiracy existed between Myers, Morley, and Yokum to induce a breach of the Plaintiffs' employment relationship with LFCU. It would be clear to any person that disclosing the names of those who gave adverse information would result in an adverse employment action. The Plaintiffs certainly were not going to receive a bonus for such disclosure.

 When an employment contract is terminable at will, Virginia law requires a plaintiff to present not only a prima facie case of tortious interference that demonstrates that an intentional interference caused the termination of the at will contract, but also that the defendant employed "improper methods." *Hechler Chevrolet v. General Motors Corp.*, 230 Va. 396, 337 S.E.2d 744, 748 (1985) (citing *Chaves v. Johnson*, 335 S.E.2d at 103). Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. *See id.* Specifically, "improper methods" may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship. *See id.* (emphasis added). The sole "improper method" that the Plaintiffs focus on in the case at bar is fraud. This Court is of the opinion, however, that the "improper method" of misuse of confidential information is also integral to the Plaintiffs' tortious interference count.

The Plaintiffs argue that Myers committed fraud when she promised them confidentiality and anonymity in order to induce them to express their concerns to Myers about LFCU's management and business practices. Moreover, the Plaintiffs argue that Myers knew at the time she made these alleged promises of confidentiality and anonymity that she could not, in good faith, keep confidential reports of possible violations of law or regulations secret from the LFCU Board of Directors. However, the Plaintiffs maintain that Myers could have, and should have, placed a higher premium on the Plaintiffs' anonymity and honored her commitment to those employees who provided her with information by not revealing the sources of such information. In response, the Defendants argue that Myers made no such promises of confidentiality and anonymity to the Plaintiffs.

---

6. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1355 (4th Cir.1995) (holding that in assessing the deliberateness of an employer's conduct for purposes of a constructive discharge claim under Title VII, the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions). This axiom, or one similar, has been utilized in so many criminal cases as to become part of the culture in drug cases.

For the purposes of argument, even if this Court were to find that the Plaintiffs' demonstrated a prima facie case of tortious interference with contractual relations, the Plaintiffs must also prove that the Defendants employed "improper methods" to effectuate the tortious interference with contractual relations. In determining whether the Plaintiffs have demonstrated the existence of fraud as an "improper method," this Court must analyze the elements of a fraud claim under Virginia law. It is clear, as a threshold issue, that the elements of fraud must be demonstrated by clear and convincing evidence. *See Richmond Met. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344, 346 (1998). These elements include (1) a false representation of a material fact; (2) made intentionally and knowingly; (3) with intent to mislead; and (4) resulting damage to the misled party. *See id.* Although ordinarily an action based on fraud must be predicated on unfulfilled promises or statements about future events, an exception to this rule exists. *See Elliott*, 238 Va. 237, 384 S.E.2d at 756. "An action in tort for fraud and deceit may be predicated in some cases on promises made with a present intention not to perform them; the gist of the fraud in such a situation is the fraudulent intent." *Id.*

The promise made in this case, with no present intention to perform it, is Myers' alleged promises of confidentiality and anonymity to the Plaintiffs. Again, the record contains conflicting evidence regarding whether Myers indeed promised confidentiality and anonymity to the Plaintiffs. Both Garrett and Salyer allege in their Complaints that Myers promised them confidentiality and anonymity in their discussions. *See* Garrett Am.Compl. at ¶ 16; Salyer Am.Compl. at ¶ 16. Further, Salyer states in her deposition that when she requested confidentiality from Myers, Myers told Salyer that she did not have a problem offering her confidentiality. *See* Salyer Dep. at 268:16–19. In addition, the Plaintiffs point out that Thomas Ewing, who at the pertinent time at issue was the Network Communications Supervisor for LFCU, also states in his deposition that Myers informed him that their conversation was confidential. *See* Ewing Dep. at 26. Specifically, Ewing states, in relation to his conversation with Myers, that

A: I expressed my concerns. She told me this was strictly confidential between me and her.

Q: Did you request that it be confidential or did she offer confidentiality?

A: I believe she offered it.

Q: Did she say why she was offering confidentiality?

A: No.

Q: Did you understand or did she tell you that confidentiality meant that the source of her information would remain unanimous?

A: Yes. Absolutely.

Q: Did you also intend and understand that she used the information that you shared with her to investigate and conduct her examination?

A: Yes.

Q: But without attaching your name to it?

A: Yes.

Plaintiffs also cite to the deposition of Ward, which further suggests that Myers promised confidentiality when she conducted her meetings with LFCU employees. Ward reports in his deposition that he "asked [Myers] if we were speaking confidentially. She assured me we were speaking confidentially and that nothing that I said to her would leave that room." Ward Dep. at 49:16–19.

A dispute arises, however, because Myers states in her deposition testimony that she informed both Garrett and Salyer that she had an obligation to inform the LFCU Board of Directors of any information given to her if the situation "warranted it" and that the identity of the informant may become necessary to divulge. *See* Myers' Dep. at 47–49. Specifically,

the conversation in Myers' deposition was as follows:

Q: Was there any discussion with Kathryn Salyer regarding confidentiality?

A: Yes, there was. Kathryn indicated to me that she felt that perhaps [Yokum] and I had a personal relationship, and that if she talked to me about anything that might be indicating misappropriation of funds, that I would not give her a free—what do I want to say here? That it wouldn't be kept in confidence. I assured Kathryn that I would not run immediately to [Yokum]. That our relationship was purely professional. I did also stress that, if she revealed to me anything that warranted it, I had an obligation to inform the board of directors of it.

Q: Did she ask that she not be identified as the source of the information?

A: Yes, she did.

Q: What did you say in response to that request?

A: In response to that request, it would be pretty standard to inform the employees that if there is anything that would represent a misappropriation of funds or other illegal or inappropriate action, then it may become necessary to identify who stated it.

Q: Is that what you said to Kathryn Salyer?

A: To the best of my recollection, it is, yes.

Q: You also said you met with Mr. Garrett?

A: Yes, I did.

Q: Did Mr. Garrett express any concerns of confidentiality to you?

A: I can't remember if [Garrett] directly asked me about it or if it was through Valerie Clark, but here again, whenever I met with Mr. Garrett, I did stress to him that the discussion we had was confidential as far as between him and myself; however, I did have a responsibility to report to the board of directors.

Q: Did Mr. Garrett ask that he not be personally identified?

A: I can't recall if he asked that directly or not.

Q: Did you tell Mr. Garrett that he would not be personally identified?

A: I'm pretty positive I didn't. Again, if I did mention anything, it would be basically the same as what I said to [Salyer].

 Based on the conflicting evidence contained within the record, it is abundantly clear that a genuine issue of material fact exists regarding the threshold issue of whether Myers promised confidentiality and anonymity to Plaintiffs. As a result, it would be improvident for this Court to grant summary judgment at this stage in the litigation. This is clear because when the resolution of an issue is based on the credibility of witnesses, summary judgment is not appropriate. *See Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir.1991); *see also United States v. Burgos*, 94 F.3d 849, 868 (4th Cir.1996) (en banc) ("Determining credibility of witnesses and resolving conflicting testimony falls within the province of the factfinder, not the reviewing court.") (citation omitted). Thus, it must be left to the jury to resolve this conflicting testimony and determine the credibility of the witnesses. The Plaintiffs have demonstrated that there are specific facts in the record that create a genuine issue for trial. Defendants' Motions for Summary Judgment in regard to Plaintiffs' tortious interference with contractual relations claims, as a result, are hereby **DENIED.**

## F. Fraud

 Garrett and Salyer also allege, in the alternative to their intentional interference with contractual relations claim, a claim under "the common-law tort of fraud and misrepresentation." In this claim, Garrett and Salyer allege that when Morley and Yokum called the Plaintiffs and Ward together for a meeting on February 1, 1999 and told the Plaintiffs that Myers

had "identified" two vice presidents who expressed concerns about LFCU, that the Defendants committed fraud. *See* Garrett Am.Compl. at ¶¶ 50–51; Salyer Am.Compl. at ¶¶ 50–51. Specifically, the Plaintiffs state that Morley and Yokum committed fraud by lying about Myers' identification of Garrett and Salyer in order to trick the two vice presidents into revealing exactly what information they had provided to Myers. *See id.* at ¶ 52.

In short, the Plaintiffs argue that if Myers did not identify Garrett and Salyer as the two individuals who provided information to her regarding problems at LFCU, and Morley, with Yokum's acquiescence, represented to the Plaintiffs that he did in fact know which employees had "reported possible violations" of law or regulation to Myers to extract a confession, then the Defendants intentionally misled the Plaintiffs. As a result, the Defendants induced the Plaintiff's reliance so that Yokum could terminate the Plaintiffs from their employment at LFCU. *See id.* at ¶ 53. As such, the Plaintiffs allege that they relied on Morley's representation that he knew the identity of the two vice presidents who reported concerns about Yokum paying off Elvington's credit card debt. *See id.* at ¶ 54. Finally, the Plaintiffs allege that they were harmed as a result of their reliance because their employment at LFCU was terminated. *See id.* at ¶ 55.

As stated earlier, a plaintiff asserting a cause of action for fraud under Virginia law bears the burden of proving, by clear and convincing evidence, the following elements: (1) a false representation of a material fact; (2) made intentionally and knowingly; (3) with intent to mislead; and (4) reliance by the party misled that results in damage to that party. *See Richmond Met. Auth.*, 507 S.E.2d at 346.

It is unclear whether Garrett or Salyer have any evidence that Morley or Yokum

misrepresented anything to the Plaintiffs by stating that Myers had identified them as vice presidents who expressed concern about LFCU. Although Myers may not have expressly named the vice presidents who provided her with information regarding their concerns about LFCU in her initial meeting with Morley, she did state that when she talked with Morley about the employees' concerns, "he kind of indicated that he could pretty much guess which ones may have indicated these things." Further, she stated that Morley then guessed that both Garrett and Salyer had expressed their concerns to Myers. When asked if she had acknowledged or affirmed Morley's identification of Garrett and Salyer, Myers answered that

> [d]uring the meeting with Mr. Morley, he asked me if I would identify those people. I stated I would not. He said, 'If I provide you with names, would you tell me'—I believe his terminology was something to the effect—'if I'm in the right ballpark?' He mentioned names and I believe I may have answered, yes, he was very close in the right ballpark.

Myers Dep. at 95. Moreover, Morley states in his deposition that in the week prior to meeting with the vice presidents to determine who had told Myers about the rumor, he telephoned Myers and asked her "if she would give [him] the names of the two people who told her ... Mrs. Yokum had paid off Mrs. Elvington's credit card." In response, Morley states that Myers responded "sure" and that she gave the names to Morley for the first time.[7] After speaking with Myers, Morley met with Yokum and told her that he was "extremely disappointed and didn't understand why two vice presidents had told the examiner something that was not true." It is clear that under any interpretation, Myers conveyed to Morley the information that Garrett and Salyer were involved.

---

**7.** Again, Myers denies that she passed on this information to Morley in their telephone con-

versation. *See* Myers Dep. at 51.

Plaintiffs argue that the fact that Ward was called into the February 1, 1999 meeting, along with Garrett and Salyer, further evidences that Morley and Yokum did not know exactly which two individuals allegedly had told Myers that Yokum paid off Elvington's credit card. However, Ward states in his deposition that when he asked Morley at that meeting whether he was being accused of having told Myers that Yokum had paid off Elvington's debt, Morley denied that he was making such an accusation and further stated that Myers had not told him that he had passed on such information at all. *See* Ward Dep. at 57.

Whichever version of the events described above actually occurred, it seems clear that Morley knew the identities of the two individuals who had expressed certain concerns about LFCU to Myers. This is true regardless of whether Myers expressly told Morley such information or she indirectly told him. The Plaintiffs have no evidence that Morley did not know who the two individuals were that told Myers about the rumor regarding Yokum paying off Elvington's debt. Moreover, Salyer states in her deposition that she cannot remember if she admitted to Morley and Yokum during the February 1, 1999 meeting that she had told Myers the rumor that Yokum had paid off Elvington's debt. *See* Salyer Dep. at 300:7–16. This fact only sheds more doubt on the Plaintiffs' claims that the Defendants fraudulently induced them to reveal to Morley the information they imparted to Myers. Therefore, the Plaintiffs have failed to make a showing sufficient to establish an essential element of their fraud claim and thus, no genuine issue of material fact exists regarding the Plaintiffs' fraud count. As such, the Plaintiffs' fraud claim may not survive summary judgment. Defendants' Motions for Summary Judgment regarding the Plaintiffs' claims of fraud are **GRANTED.**

### III *Conclusion*

Based on the reasons stated above, Defendants' Motions for Summary Judgment are **GRANTED IN PART** in relation to Plaintiffs' claim for fraud and **DENIED IN PART** in relation to Plaintiffs' claims under 12 U.S.C. § 1790b, the credit union employee protection remedy of the FCUA, and their claims for tortious interference with contractual relations.

The Clerk of the Court is **DIRECTED** to mail a copy of this order to all counsel of record.

**IT IS SO ORDERED.**